**FILMS BY JOVE, INC., and Soyuzmultfilm Studios, Plaintiffs,**

v.

**Joseph BEROV, Natasha Orlova, The Rigma America Corporation, and Saint Petersburg Publishing House and Group, Defendants.**

No. CIV.A.98–CV–7674(DGT).

United States District Court, E.D. New York.

April 16, 2003.

as Corrected May 8, 2003.

Julian H. Lowenfeld, New York, NY, Kenneth A. Feinswog, Los Angeles, CA, for Plaintiffs.

Paul R. Levenson, Peter G. Eikenberry, Scott A. Ziluck, Kaplan, Gottbetter & Levenson, LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

This litigation began in December of 1998 when plaintiffs Films By Jove, Inc. ("FBJ") and Soyuzmultfilm Studio ("SMS"[1]) brought an action for copyright infringement, breach of contract, unfair competition, and RICO violations against Joseph Berov ("Berov"), Natasha Orlova, Rigma America Corporation, and the St. Petersburg Publishing House and Group. A state-owned Russian company, the Federal State Unitarian Enterprise Soyuzmultfilm Studio ("FSUESMS"), subsequently intervened as a third-party plaintiff.[2] The central dispute between the parties concerns the ownership of copyrights in approximately 1500 animated films created by a state-owned Soviet film studio, Soyuzmultfilm Studio, between 1946 and 1991.[3]

On August 27, 2001, this court granted summary judgment in favor of the plaintiffs, relying primarily on the submissions of the parties' Soviet law experts, and also, in part, on interpretations of Soviet law from a series of decisions by the commercial courts of the Russian Federation, known as arbitrazh courts. *See Films By Jove, Inc. v. Berov*, 154 F.Supp.2d 432 (E.D.N.Y.2001). On December 18, 2001, the Presidium of the High Arbitrazh Court of the Russian Federation issued an opinion apparently overruling two of these lower court opinions. Following the High Arbitrazh Court's ruling, as well as an October 2, 2001 decision from the Paris Court of Appeals, which defendants claim supports some of their arguments, defendants filed a motion, pursuant to Rule 60(b)(2) of the Federal Rules of Civil Procedure, for reconsideration of this court's

---

1. As will become clear in the subsequent discussion, "Soyuzmultfilm Studio" (or "Soyuzmultfilm Studios," as it is sometimes called) is at once the name of a Soviet state enterprise created in 1936, a lease enterprise in existence between 1989 and 1999, and a joint stock company, named as a plaintiff in this suit. For the purposes of clarity, the abbreviation "SMS" will be used only to refer to the plaintiff joint stock company. The other entities will be referred to by their full names.

2. The defendants and the third-party plaintiff, FSUESMS, are in agreement on substantially all the facts of this case, and many of their submissions—including all of their papers in support of this motion for reconsideration—have been jointly filed. Throughout this opinion, it may be generally assumed that any arguments attributed to "defendants" are likewise advanced by FSUESMS, and vice versa.

3. The complexities of the dispute defy concise description. However, for the moment it should be explained that SMS and FSUESMS are Russian enterprises, each of which claims to be the present successor to the original Soyuzmultfilm Studio and the rightful inheritor of the studio's copyright interests. FBJ is an American film company that, in 1992, obtained an exclusive license for Soyuzmultfilm Studio's films from a predecessor to SMS. FBJ subsequently embarked on an extensive project to restore the films, dubbing them in several languages for distribution in the international market—only to have the validity of its license retroactively challenged by FSUESMS.

August 27, 2001 decision, and for a stay of any enforcement proceedings pursuant to Rule 62(b).

Plaintiffs counter that the French and Russian decisions upon which defendants base their motion in fact establish no basis for reconsideration. The Paris Appeals Court's decision, which, according to plaintiffs, has been appealed, is inconsistent with a previous ruling of the same court, upheld by the court of last resort, in another suit involving the same parties and turning on identical questions of Russian law. Moreover, plaintiffs contend that a French court's interpretation of Russian law is, in any event, not controlling on this court.

An opinion from Russia's High Arbitrazh Court is no doubt of greater significance as evidence of the content of Russian law. However, plaintiffs contend that the December 18, 2001 decision, nevertheless, does not warrant reconsideration. *First*, plaintiffs claim that, although invited by this court to await the results of future decisions from the Russian courts, the parties expressly stipulated at oral argument that they would accept an immediate ruling. *Second*, plaintiffs maintain that even if this court were to entertain a motion to reconsider in reliance on the December 18 decision, notwithstanding the parties' stipulation, that opinion does not address the question of copyright ownership central to this case and, therefore, provides no basis for altering the previous ruling in favor of plaintiffs. *Third*, plaintiffs contend that because Russia is a civil law jurisdiction, which lacks a system of *stare decisis*, it is appropriate for this court to ignore the holding of the High Arbitrazh Court and to make an independent assessment of Russian law based on the submissions of the parties' experts—especially inasmuch as the High Arbitrazh Court's decision adopts an unprecedented and illogical construc-

tion of Soviet statutory law. *Fourth*, plaintiffs have submitted an affidavit from a distinguished Russian jurist advancing general allegations of corruption and institutional biases against private enterprise within the Russian courts and presenting specific evidence of undue governmental influence over the arbitrazh court proceedings leading up to the December 18, 2001 decision. These facts, according to plaintiffs, explain the peculiar nature of the decision and demonstrate that the opinion was the product of judicial misconduct. Based on this evidence, plaintiffs argue that for this court to vacate its ruling in reliance on the High Court's decision would violate plaintiffs' rights, in essence confiscating FBJ's substantial investment in developing the commercial value of Soyuzmultfilm Studio's animated films for the international market. Giving effect to the High Arbitrazh Court's December 18, 2001 decision would therefore offend domestic public policy with respect to private property rights, as well as norms of international law. Thus, if the decision is determined to have any relevance, plaintiffs contend that it should nevertheless be afforded no deferential weight. *Fifth*, plaintiffs advance an alternative claim to the disputed copyrights rooted in principles of equity and agency law.

### Background

#### (1)

According to plaintiffs, on May 22, 1992, a valid licensing agreement was signed between FBJ, a California corporation, and the legal successor to a former state-owned Soviet film studio, Soyuzmultfilm Studio. *See* Mem. of Law in Supp. of Pls.' Mot. to Dis. the 3D–Party Compl. Pursuant to FRCP 12(b)(6) [hereinafter "Pls.' Mot. Dis."] at 3. Founded in 1936, on property that had been expropriated by the Soviet state from the Russian Orthodox Church, Soyuzmultfilm Studio created ap-

proximately 1500 animated motion picture films, many of which became very popular. *See id.* at 2. SMS, a privately-owned Russian joint stock company, is the successor to the entity with which FBJ entered into the May 1992 agreement. Thus, SMS claims to be the current successor to the original state enterprise Soyuzmultfilm Studio. *See* Decl. of Mila Straupe, Ex. 15, attached to Decl. of Julian Lowenfeld [hereinafter "Straupe Decl."] ¶ 12. The 1992 agreement purported to make FBJ the exclusive licensee worldwide for the animated films in the Soyuzmultfilm library, including those produced during the period of state ownership. *See* Pls.' Mot. Dis. at 3.

In reliance on this agreement, FBJ invested more than three million dollars to restore and update the library of films, which, plaintiffs submit, was in "woeful condition" in 1992. Mem. of Law in Supp. of Pls.' Mot. for Summ. J. and in Opp'n to Defs.' Mot. for Summ. J. [hereinafter "Pls.' Mot. for Summ. J."] at 19. FBJ further embarked on an extensive revoicing project, hiring famous actors to produce English, French, and Spanish versions of the original Russian-language animated films. *See* Decl. of Joan Borsten, Ex. 16, attached to Decl. of Julian Lowenfeld [hereinafter "Borsten Decl."] ¶ 5.

FBJ and SMS accuse Berov, who operates several stores in Brooklyn that sell Russian-language entertainment products, of violating their exclusive rights in Soyuzmultfilm Studio's films.[4] *See* Pls.' Mot. Dis. at 3. Defendants counter that SMS's claim to the copyrights is invalid and that SMS's predecessor, the entity that purported to make FBJ the exclusive licensee of the Soyuzmultfilm library of animated films, was likewise not a legitimate copyright holder and thus lacked the authority to grant that license. *See* Mem. of Law in Opp'n to Mot. for Summ. J. by Pls./3D–Party Defs. and in Supp. of Cross–Mot. for Summ. J. by 3D–Party Pl. [hereinafter "FSUESMS's Cross–Mot."] at 5–6; Decl. of Peter B. Maggs [hereinafter "Maggs Decl."] ¶ 69. Instead, defendants contend that the copyrights in question are in fact owned by the Russian state, and are under the "operative management"[5] of the third-party plaintiff, FSUESMS, which intervened in this case claiming that it, rather than SMS, is the lawful successor to the original state-owned Soyuzmultfilm Studio. *See* 3D–Party Compl. ¶ 8.

Thus, "[a]lthough this dispute started out purely as an infringement action by FBJ against the defendants, it has become a full-fledged dispute about copyright ownership between FBJ/SMS and FSUESMS." *Films By Jove,* 154 F.Supp.2d at 434 n. 5. Ultimately, the resolution of the present dispute requires determining who was the initial owner of the copyrights in the films produced by the state enterprise Soyuzmultfilm Studio,

---

4. More precisely, Berov operates his stores through the Rigma America Corporation, doing business as St. Petersburg Publishing House. Berov is Rigma's sole officer, director, and shareholder. Defendants identify Natasha Orlova as "a sometime employee of Rigma who has no ownership interest in the company." Defs.' Mem. in Opp'n to Pls.' Mots. for Partial Summ. J. and for Ord. of Contempt and in Supp. of Defs.' Cross–Mot. for Partial Summ. J. [hereinafter "Defs.' Cross–Mot."] at 5.

5. "Operative management" is a term used to describe a form of control over property without actual ownership. During the Soviet period, when practically all property was state-owned, property assigned by the state to a state enterprise was said to be under the operative management of the enterprise, which had the right to possess and use the property, while title remained with the state. *See* Maggs Decl. ¶ 19 (citing W.E. Butler, *Soviet Law* 169–70 (1983)).

and, more importantly, how, if at all, the reforms of Perestroika, in the late 1980s, affected the ownership of the studio's intellectual property rights.

(2)

The complex and colorful history of the state-owned Soviet film studio that created the disputed films is examined in great detail in this court's August 27, 2001 opinion. A general familiarity with the underlying facts and with the parties' arguments will be assumed throughout this decision. Suffice it to say that plaintiffs and defendants (and their respective experts) have offered fundamentally different accounts of the studio's history, which, for the purposes of the instant motion, will be summarized as set forth below.

### (a) Plaintiffs' Version

Plaintiffs' experts explain that under Soviet law the copyrights in the disputed films belonged as an initial matter to the studio that created the films, rather than to the Soviet state. See Decl. of Michael Newcity [hereinafter "Newcity Decl."] ¶¶ 15, 20–52; Reply Decl. of Paul B. Stephan [hereinafter "Stephan Reply Decl."] ¶ 5 n. 1; Notice of Mot. to Dis. 3D–Party Compl. Pursuant to FRCP 12(b)(6) [hereinafter "Pls.' Not. Mot. Dis."] at 7–9. From its inception in 1936 until 1989, Soyuzmultfilm Studio, like practically all enterprises in the Soviet Union, operated as a state enterprise. See Pls.' Mot. Dis. at 2. However, according to plaintiffs, in December 1989, pursuant to new legislation liberalizing the structure of ownership in the Soviet economy, the state enterprise

was transformed into a "lease enterprise" or "rent entity," also called Soyuzmultfilm Studio. See id. at 2–3.

Plaintiffs note that "[m]any state companies became rent enterprises in the late 1980s and 1990s. In accordance with law, they stopped to be 'state-owned', but having in mind a further transition to privately held companies, they acquired another legal status, taking on lease only state buildings and equipment, but keeping their income and products for themselves and thus they received freedom from the state." Straupe Decl. ¶ 11. Under the terms of a lease agreement with the Soviet State Film Committee, known as Goskino,[6] the lease enterprise Soyuzmultfilm Studio paid rent to the state in exchange for a ten-year lease on the state-owned tangible property previously assigned to the former state enterprise Soyuzmultfilm Studio—i.e., the studio's facilities and equipment. Pls.' Mot. Dis. at 3.

More importantly, for the purposes of the present dispute, at the time the lease agreement entered into effect, plaintiffs contend, the original state enterprise ceased to exist, having been transformed into the lease entity, which was, according to the Soviet legislation governing the creation of lease enterprises, the legal successor to the rights and duties of the state enterprise it effectively replaced. As a result of this transformation, the copyrights in the disputed films passed by operation of law to the lease entity.[7] See Straupe Decl. ¶ 11.

---

6. Goskino, which literally translates as "government film," is a government ministry generally charged, during the Soviet era, with overseeing all aspects of film production and distribution.

7. The precise legal act that officially established the lease enterprise remains somewhat unclear. In an official document dated December 12, 1989, Goskino ordered that Soyuzmultfilm Studio be "transfer[ed] ... to lease as of December 15, 1989." Ex. E, attached to Decl. of Sergey Skuliabin. However, the lease agreement with Goskino was executed on December 20, 1989, and plaintiffs have indicated that Soyuzmultfilm Studio became a lease enterprise on that date. See Pls.' Mot. Dis. at 2. FSUESMS's Russian law

Moreover, unlike the state-owned tangible property, which was returned to the Russian state at the end of the lease term, the copyrights, which were initially studio property in the plaintiffs' version of the story, did not revert upon termination of the lease. *See* Decl. of Paul B. Stephan [hereinafter "Stephan Decl."] ¶ 9 ("[I]ntellectual property rights transferred to the lease enterprise were not leased, but rather fully owned by the lease enterprise."). Indeed, according to plaintiffs, there was no longer any state enterprise in existence to claim a reversion interest in the copyrights at the end of the lease term, since the original state enterprise Soyuzmultfilm Studio had been transformed, in 1989, into the lease enterprise bearing the same name. In May 1992, the lease entity, which, according to plaintiffs, had full title to the copyrights as the legal successor to the antecedent state enterprise, granted the exclusive license to FBJ as described above.

In July 1999, shortly before the lease was set to expire, the lease enterprise Soyuzmultfilm Studio was itself reorganized, this time in the form of a fully-privatized joint stock company. *See* Straupe Decl. ¶ 12. That joint stock company is SMS, one of the plaintiffs in this case. Upon expiration of the lease term, the premises and equipment that had been leased from the Soviet state had to be returned. Accordingly, SMS moved the studio's offices to another location in a suburb of Moscow, taking with it the copyrights, ownership of which had passed to SMS, again by operation of law, as a con-

sequence of the reorganization of lease enterprise.[8] *See id.* ¶ 13.

On June 30, 1999, in response to the demands of a faction of disgruntled Soyuzmultfilm Studio employees who had lost an internal power struggle for control of the lease enterprise, the Prime Minister of the Russian Federation, Sergei Stepashin, issued a decree accepting a proposal of the Russian Property Ministry that called for the establishment of a new state enterprise to take over the state-owned facilities and equipment that had been leased for ten years to the lease enterprise. *See* Pls.' Mot. Dis. at 5; Ex. 17, attached to Decl. of Julian Lowenfeld [hereinafter "Stepashin Order"]; Tr. of Aug. 17, 2000 Hearing at 20. This new state entity, organized as a federal state unitarian enterprise, is FSUESMS, the third-party plaintiff in the present action. According to plaintiffs, it was only later, after the Russian Orthodox Church initiated a lawsuit to reclaim the property that had been expropriated from it in 1936, that FSUESMS, backed by Goskino and the State Property Ministry, began to advance the unfounded contention that FSUESMS was in fact a continuation of the original state enterprise and was, therefore, the rightful inheritor of Soyuzmultfilm Studio's extensive film library. *See* Pls.' Mot. Dis. at 5.; Borsten Decl. ¶ 14.

In December 1999, a year after plaintiffs commenced their infringement suit against Berov in this court, and more than seven years after FBJ acquired its Soyuzmultfilm copyright license from the lease enterprise, FBJ received a letter from E. Rahi-

---

expert suggests that the lease enterprise "existed de facto from the time of the signing of the lease" but did not register as a legal entity until November 14, 1990. Maggs Decl. ¶ 12. In any event, it is undisputed that the lease enterprise Soyuzmultfilm Studio did come into existence and that its facilities, personnel and equipment were substantially indistin-

guishable from those of the original state enterprise Soyuzmultfilm Studio.

8. Of course, SMS's interest in the copyrights was subject to the license agreement with FBJ entered into by SMS's predecessor in interest, the lease enterprise.

mov, the director of FSUESMS,[9] asserting that Soyuzmultfilm Studio had been restored to its prior status as a state enterprise, that the copyrights for films produced by Soyuzmultfilm Studio prior to 1989 belonged to the Russian state, and that, therefore, any contractual arrangements between SMS and FBJ concerning such films were invalid. *See* Borsten Decl. ¶ 14.

In sum, plaintiffs argue that: 1) Soviet law had since 1936 vested ownership of the copyrights for the animated films produced by the state enterprise Soyuzmultfilm Studio in the studio itself rather than the Soviet state; 2) in 1989, upon execution of the lease agreement with Goskino, the state enterprise was transformed into a lease enterprise, at which point full title to the copyrights passed by operation of law to the lease enterprise, which was the legal successor to the now-defunct state enterprise; 3) in 1992, the lease enterprise granted a copyright license to FBJ; 4) upon expiration of the lease in 1999, the copyrights, subject to FBJ's license, passed to the joint stock company SMS, while 5) the tangible equipment and facilities leased to the rent entity by Goskino on behalf of state reverted to the state; and 6) the state then transferred its tangible property to FSUESMS, a state enterprise newly-created in 1999 to take over the state-owned property formerly assigned to the original state enterprise Soyuzmultfilm Studio and leased for ten years to the lease enterprise.

### (b) Defendants' Version

Defendants have offered a fundamentally different version of events. First, they claim that the copyrights in the films produced by the state enterprise Soyuzmultfilm Studio were always owned by the state and were merely under the "operative management" of the studio. *See* Maggs Decl. ¶ 18; FSUESMS's Cross–Mot. at 6–7. It follows from this premise that the lease enterprise could not have acquired plenary ownership of the disputed copyrights from the state enterprise, whether by outright transfer or by operation of law, since the state enterprise, according to defendants, had no such ownership rights in the Soyuzmultfilm copyrights to convey. *See* FSUESMS's Cross–Mot. at 8.

Alternatively, even if the state enterprise were the initial owner of the copyrights, defendants emphatically deny plaintiffs' contention that the state enterprise was transformed into the lease enterprise in 1989 and ceased to exist thereafter. Instead, defendants argue that the state enterprise went into a period of "suspended animation," 2d Supp. Decl. of Peter B. Maggs [hereinafter "Maggs 2d Supp. Decl."] ¶ 11, during the ten-year term of the lease, and was revived in 1999 in the form of a federal state unitarian enterprise, as FSUESMS.[10] Because, according to defendants, the state enterprise Soyuzmultfilm Studio was not transformed or reorganized in 1989, no rights passed to the rent entity by operation of law. *See* Reply Mem. of Law of Defs. and 3D–Party Pl. in Supp. of Jt. Mot. for Recons. and Modification [hereinafter "Defs.' Reply Mem. for Recons."] at 5. Therefore, the only assets that the lease enterprise acquired were those expressly specified in the lease agreement. Under the terms of

---

**9.** Rahimov had previously served as deputy director of the lease enterprise until he was fired in August 1999. *See* Decl. of Sergey Skuliabin ¶ 6.

**10.** According to defendants, this change was mandated by the Civil Code of the Russian Federation, First Part, adopted in 1994, which abolished the state enterprise form under which the original Soyuzmultfilm Studio had been registered. *See* Maggs Decl. ¶ 11.

that agreement, the lease enterprise received, in exchange for rental payments to the state, a ten-year lease on the state-owned tangible property previously assigned to the state enterprise Soyuzmultfilm, including its equipment and offices.[11] The lease did not on its face purport to transfer any copyrights to the lease entity. Even if the copyrights had somehow passed in connection with the lease agreement, defendants maintain that any such transfer would be subject to the limit of the ten-year lease term, at which point the copyrights, like the tangible property, would have reverted to the state. *See* 9th Supp. Decl. of Peter B. Maggs [hereinafter "Maggs 9th Supp. Decl."] ¶ 10. Moreover, defendants argue that the Soviet legislation regulating the formation of lease enterprises only permitted lease entities to transfer "material valuables"—i.e., tangible property. Therefore, the lease enterprise Soyuzmultfilm Studio had no authority to enter into the 1992 copyright license agreement with FBJ and likewise could not have transferred any interest in the films to SMS upon expiration of the lease term. *See* Maggs Decl. ¶¶ 41–42.

Thus, defendants maintain that: 1) the copyrights in the films produced by the state enterprise were owned initially by the state; 2) the 1989 lease agreement did not terminate the state enterprise or cause its transformation into a lease entity, but rather 3) merely transferred state-owned tangible property to the lease enterprise for a period of ten years; [12] 4) upon termination of the lease, the property leased by the state reverted to state ownership, and was assigned to FSUESMS, 5) which is a continuation of the original Soyuzmultfilm Studio, reorganized, in compliance with Russian legislation, in the form of a federal state unitarian enterprise.

(3)

### French Litigation

Shortly after FBJ and the lease enterprise executed the licensing agreement in May 1992, the two companies became involved in two separate lawsuits in France, seeking to combat alleged infringement of the Soyuzmultfilm Studio copyrights by Sovexportfilm, an entity that throughout much of the Soviet period had exercised monopoly rights over the foreign distribution of films produced by Soviet film studios.[13] *See* Tr. of Aug. 18, 2000 Hearing at 183–85.

11. The exact terms of the December 1989 agreement gave the lease enterprise a lease on the assets that appeared on the balance sheet of the state enterprise as of the date of the agreement. *See* Dec. 20, 1989 Lease Agreement, attached to Oct. 30, 2000 Letter of Julian Lowenfeld [hereinafter "Lease Agreement"] ¶ 1.1. These balance sheets have never been submitted to this court, and plaintiffs claim that they may not even exist. *See* Tr. of June 5, 2001 Oral Arg. at 34–49. In any event, all the parties appear to agree that the balance sheets of the state enterprise would have listed the enterprise's material assets only and would not have included intangible assets, such as copyrights. Defendants have argued that the absence of the copyrights from the balance sheets is fatal to plaintiffs' claim; plaintiffs, of course, argue that the balance sheets are essentially irrelevant to the instant dispute, since the copyrights passed not through the terms of the lease but by operation of law.

12. Defendants' view is that it is actually impossible, based on the current record, to determine with precision the specific assets that were transferred to the lease enterprise under the lease agreement, because plaintiffs have never produced Soyuzmultfilm Studio balance sheets from December 1989.

13. Joan Borsten, President of FBJ, represents that copyright infringement actions were also initiated against Sovexportfilm in Mexico and Japan. *See* Borsten Decl. ¶ 4. However, evidence regarding these suits has not been presented to this court.

According to plaintiffs, although Perestroika-era reforms eliminated Sovexportfilm's export monopoly in 1988, and granted the film studios the exclusive right to exploit their film copyrights commercially through direct contracts with foreign investors, Sovexportfilm continued to sell rights in films produced by Soyuzmultfilm Studio, and other Russian film studios, without obtaining the studios' permission. *See id.*

In 1993, believing that Sovexportfilm's infringing activities threatened to compromise the commercial value of FBJ's exclusive license, FBJ and the lease enterprise Soyuzmultfilm Studio initiated a copyright infringement suit against Sovexportfilm in France. *See id.* at 184. Initially, the County Court of Paris dismissed the suit. However, in a ruling handed down on September 12, 1997, the Court of Appeals of Paris overturned this decision and ruled in favor of the plaintiffs. *See* Court of Appeals of Paris, Sept. 12, 1997 Dec., Ex. 14, attached to Decl. of Julian Lowenfeld [hereinafter "Sept. 12, 1997 French Dec."]. The appeals court found that the copyrights for films produced during the Soviet period by Soyuzmultfilm Studio belonged to the studio, and that, at least since September 19, 1989, the studio had exclusive rights to sell its films in foreign markets. *See id.* at 12. Accordingly, the appeals court concluded that Sovexportfilm could not license any films produced by Soyuzmultfilm Studio without obtaining the studio's permission. Therefore, Sovexportfilm committed copyright infringement by engaging in such unapproved licensing transactions in France. *See id.* at 12–14. Recognizing that, in May 1992, Soyuzmultfilm Studio had "ceded the totality of its exploitation rights to [FBJ]," *id.* at 13, the court concluded that FBJ was "entitled and justified in its claims of copyright infringement." *Id.* at 14. This ruling was upheld by the final court of appeals, the French High Cassation Court, on July 6, 2000. *See* French High Cassation Court, July 6, 2000 Dec., Ex. 14, attached to Decl. of Julian Lowenfeld [hereinafter "July 6, 2000 French Dec."].

In 1994, FBJ and the lease enterprise, together with two other Russian films studios, Mosfilm and Lenfilm, took part in a second litigation in France challenging Sovexportfilm's unauthorized licensing of Soviet films. *See* Tr. of Aug. 18, 2000 Hearing at 185. This case raised essentially the same legal issues as the first suit, *viz.* the ownership of copyrights and attendant commercial exploitation rights in films produced by Soviet film studios. However, according to plaintiffs, most of the films that were the subject of the second suit had not been considered in the first suit. *See* Decl. of Joan Borsten in Opp'n to Defs.' Mot. for Recons. [hereinafter "Borsten Decl. in Opp'n to Recons."] ¶ 4. On June 19, 1996, the Commercial Court of Paris ruled in favor of FBJ, Soyuzmultfilm Studio, Mosfilm Studio, and Lenfilm Studio. Rejecting the defendants' claim that Goskino, "having financed the films" on behalf of the Soviet state "became owner of the copyrights," the court found that Soviet law clearly established "[t]he Studios['] inalienable rights [in] their works." Commercial Court of Paris, June 19, 1996 Dec., Ex. 14, attached to Decl. of Julian Lowenfeld [hereinafter "June 19, 1996 French Dec."] at 9. The Commercial Court of Paris further concluded that Soviet economic reforms enacted in 1986 and thereafter had put an end to the state monopoly on foreign trade, and that Sovexportfilm could therefore no longer license films produced by Russian studios without the agreement of the studios, which were the rightful copyright holders. *See id.* at 9–11.

On October 2, 2001, the Paris Court of Appeals, the same court whose September 12, 1997 decision in favor of the lease enterprise Soyuzmultfilm Studio and FBJ

was upheld by the French High Cassation Court on July 6, 2000, reversed course and overturned the June 19, 1996 decision of the Commercial Court of Paris. *See* Court of Appeals of Paris, Oct. 2, 2001 Dec., Ex. CC, attached to 6th Supp. Decl. of Robert W. Clarida [hereinafter "Oct. 2, 2001 French Dec."]. The appeals court acknowledged that pursuant to Article 486 of the Soviet Civil Code, "the copyright of feature and documentary films belongs to the enterprise which executed their production." *Id.* at 25. Nevertheless, the court found that, for the Soviet-era films at issue in the French litigation, the right of commercial exploitation of the copyrights "belonged exclusively to the GOSKINO of the USSR which exercised it through the mediation of ... SOVEXPORTFILM," and therefore Sovexportfilm did not engage in copyright infringement by licensing those films in France. *Id.* at 26.

Thus, at present, the French courts, in two separate litigations, have reached inconsistent—indeed, flatly contradictory—conclusions with regard to the validity of FBJ's exclusive copyright license.[14] The first ruling in favor of FBJ has been upheld by the court of last resort. Plaintiffs represent that the October 2, 2001 decision resulted from an incomplete presentation of Soviet law to the French court and that the decision is currently on appeal. *See* Borsten Decl. in Opp'n to Recons. ¶¶ 12–

16. To date, the parties have provided no further information concerning the status of the appeal.

### (4)

### Russian Litigation

While the present infringement action was pending in this court, SMS and FSUESMS were engaged in two separate series of lawsuits before the Russian arbitrazh courts,[15] in which each claimed to be the rightful successor to the state enterprise Soyuzmultfilm Studio, and each sought to nullify the other entity's corporate registration. The Public Prosecutor of the Moscow Region, together with the Ministry of State Property of Russia, Goskino, and FSUESMS, commenced the first of these two parallel proceedings in the Moscow Region Arbitrazh Court on November 11, 1999. *See* Maggs Decl. ¶ 27. SMS subsequently commenced the second suit against FSUESMS in the same court, *see id.* ¶¶ 28–29, with the Ministry of State Property and Goskino evidently intervening on FSUESMS's behalf, in order to protect the interests of the Russian state.

The validity of SMS's and FSUESMS's respective corporate registrations was the focus of both litigations. However, "some of [the] cases found occasion to address

14. From the perspective of an American court, it is curious that the Paris Appeals Court's findings in the first suit—that Soyuzmultfilm Studio had the exclusive right to sell its films abroad and that the studio legitimately transferred its commercial exploitation rights to FBJ—evidently had no preclusive effect against Sovexportfilm in the second litigation. Though no expert testimony concerning French procedure has been presented to this court, it would appear that the French courts do not recognize the principle of collateral estoppel/issue preclusion.

15. The Russian judiciary consists of two separate court systems. The courts of general jurisdiction handle criminal law, family law, and other non-commercial cases. The arbitrazh courts have exclusive jurisdiction over disputes between commercial enterprises. *See* 7th Supp. Decl. of Peter B. Maggs [hereinafter "Maggs 7th Supp. Decl."] ¶ 26; Sarah Reynolds, *Handbook on Commercial Dispute Resolution in the Russian Federation* 9 (Igor Abramov, ed., U.S. Dep't of Commerce, 2000), *available at* http://www.mac.doc.gov/INTERNET/Handbook—July—2000.pdf ("The 'arbitrazh courts' in the Russian Federation are a system of courts which have jurisdiction over most commercial disputes and many other cases involving business entities.").

the possession of the copyrights in the state enterprise Soyuzmultfilm Studio's library." *Films by Jove*, 154 F.Supp.2d at 439. Although FBJ was not a party to any of the litigation in the Russian arbitrazh courts, the validity of FBJ's license, which, of course, is essential to plaintiffs' infringement action, hinges on determining whether, in 1989, the lease enterprise succeeded to the intellectual property rights of the state enterprise Soyuzmultfilm Studio such that it could properly license the copyrights in the studio's Soviet-era films. The parties' experts vigorously debate the significance of the legal conclusions reached in the arbitrazh court decisions, disputing the holdings of many of the cases, as well as whether, and to what extent, the various decisions control the outcome of this case. In the August 27, 2001 decision granting summary judgment to the plaintiffs, this court, without treating any arbitrazh court opinion as dispositive, referred extensively to the Russian decisions in explaining and justifying its conclusions regarding the relevant Russian law.

In the suit brought by FSUESMS and the Russian government, the Moscow Region Arbitrazh Court ruled in favor of SMS on March 6, 2000, and this decision was upheld by the Moscow Region Arbitrazh Appeals Court on June 7, 2000. The SMS-initiated suit likewise resulted in two early victories for the joint stock company: a favorable ruling from the Moscow Region Arbitrazh Court on June 5, 2000, which was upheld by the appeals court on July 24, 2000. The initial decisions in both litigations found that the right to the copyrights in the films and the trademark in

the name Soyuzmultfilm Studio, among other intangible rights, passed to the lease enterprise by operation of law, and were legitimately transferred to the joint stock company. Moreover, in support of plaintiffs' theory of the case, the courts found no connection between the original state enterprise Soyuzmultfilm Studio and FSUESMS. *See* June 5, 2000 Dec., Ex. 19, attached to Decl. of Julian Lowenfeld [hereinafter "June 5 Dec."]; July 24, 2000 Dec., Ex. 20, attached to Decl. of Julian Lowenfeld [hereinafter "July 24 Dec."]; Discussion of Mar. 6, 2000 and June 7, 2000 Decs. within Aug. 18, 2000 Dec., Ex. 18, attached to Decl. of Julian Lowenfeld [hereinafter "Aug. 18 Dec."].

These initial decisions were vacated, however, by the Federal Arbitrazh Court for the District of Moscow, which remanded the cases to the Moscow Region Arbitrazh Court, instructing the court to consider evidence that the copyrights and other non-material assets may have belonged to the state at the time the lease agreement was executed and that these assets consequently never passed to the lease enterprise, or to its successor, SMS. *See* Aug. 18 Dec. (remanding the first suit); Sept. 25, 2000 Dec., Ex. G, attached to Decl. of Robert W. Clarida [hereinafter "Sept. 25 Dec."] (remanding the second suit).[16]

### (a) FSUESMS's Suit Against SMS on Remand

### Moscow Region Arbitrazh Court: December 26, 2000

On remand in the suit brought by FSUESMS, the Ministry of State Property of the Russian Federation, and Goskino

---

**16.** SMS evidently attempted to seek review of the August 18, 2000 decision by the High Arbitrazh Court. In a letter dated September 19, 2000, the Deputy Chairman of the High Court indicated that a further appeal was premature. However, he emphasized that the decision of the Federal Arbitrazh Court for the District of Moscow did not represent a binding view of the evidence in the case, and that SMS would be afforded an opportunity to argue its position on remand. *See* Arifulin Letter, Ex. 7, attached to Stephan Decl., Jan. 22, 2001.

against SMS, the Moscow Region Arbitrazh Court, by and large, reinstated and expanded upon its earlier findings and conclusions. Of all the opinions to emerge on remand, the December 26, 2000 decision was the only to address at length the question of copyright ownership, essentially adopting the theory of the case put forth by plaintiffs in the present action. First, the court concluded that, according to Article 486 .of the Soviet copyright law, "the copyrights to a film belong to the enterprise that shot the film." [17] Dec. 26, 2000 Dec., Ex. 8, attached to Stephan Decl., Jan. 22, 2001[hereinafter "Dec. 26 Dec."] at 6. The court went on to hold that, upon the signing of the lease agreement, the state enterprise was transformed into the lease entity, which was the legal successor to the state enterprise, under Article 16 of the Fundamental Principles on Leasing.[18] *See id.* at 6, 7. The reorganization of the state enterprise in turn triggered the transfer of the copyrights to the lease enterprise by operation of law pursuant to Article 498 of the Soviet copyright law, which provides that upon the reorganization of an enterprise, copyrights owned by the enterprise pass to the legal successor. *See id.* at 6.

Moreover, the court concluded that the expiration of the lease term on December 20, 1999 did not affect the ownership of the copyrights because those rights did not pass to the lease enterprise under the lease, but rather by operation of law. *See id.* In fact, the court noted, the copyrights could not have been transferred through the lease agreement because, under Soviet law, the lessor, Goskino, did not control the intellectual property rights of the state enterprise Soyuzmultfilm Studio, which were owned by the studio itself rather than the state. *See id.* at 7. Thus, the court concluded that "copyrights to the animated feature films made by [the state enterprise Soyuzmultfilm Studio] belonged to the Studio without time limit, and upon its reorganization, the copyrights went to the [l]ease enterprise ... also with no term limitations." *Id.* at 6.

The December 26, 2000 decision explicitly rejected as without foundation the argument that "the copyrights to the animated films belong to [FSUESMS]." *Id.* at 7. FSUESMS's alleged interest in the Soyuzmultfilm Studio copyrights was premised on the proposition, advanced by defendants in this case, that the formation of FSUESMS in June 1999 represented the resumption of the activity of the state enterprise. However, in the December 26 opinion, the court held that FSUESMS could not be a continuation of the original Soyuzmultfilm Studio because "a state enterprise, after leasing out an enterprise and complex of facilities and property, could not exist any more and could no longer be a legal person at the same time because it did not have its own property and legal capacity." *Id.*

### Moscow Region Arbitrazh Appeals Court: February 22, 2001

The Moscow Region Arbitrazh Appeals Court initially upheld the December 26,

---

**17.** Article 486 of the 1964 Civil Code provides that "[c]opyright in a motion picture ... is owned by the enterprise which made the film." Newcity Decl. ¶ 23. The majority of the films in dispute in this case were produced by Soyuzmultfilm Studio between 1946 and 1991, and thus fall under the provisions of the 1964 Civil Code. Those films produced prior to 1964 are covered by Article 3 of the Decree of the All–Union Central Executive Committee of the R.S.F.S.R., dated October 8, 1928, which similarly specifies that the copyright in a film is granted to the film studio that published it. *See id.* ¶ 24.

**18.** The Fundamental Principles on Leasing, which governs the formation of lease enterprises, was adopted in November 1989 as part of the ownership liberalization trend that accompanied Perestroika and Glasnost.

2000 decision of the Moscow Region Arbitrazh Court, in an opinion rendered on February 22, 2001. *See* Feb. 22, 2001 Dec., Ex. 6, attached to Decl. of Anya Zontova [hereinafter "Feb. 22 Dec."]. The appeals court explicitly affirmed the lower court's findings that: 1) "at the time the [state] enterprise switched to lease relations, a factual reorganization of the enterprise occurred"; and 2) as a consequence of this reorganization, "copyrights to animated films created by the state enterprise, by operation of law, and not the [lease] agreement, passed on to the successor of its rights, the lease enterprise." *Id.* at 6.

### Federal Arbitrazh Court of the District of Moscow: April 20, 2001

On April 20, 2001, the Federal Arbitrazh Court for the District of Moscow, the same court that issued the August 18, 2000 order remanding the FSUESMS-initiated suit to the Moscow Region Arbitrazh Court, overruled the December 26, 2000 decision and the appeals court ruling upholding it. *See* Apr. 20, 2001 Dec., attached to Aff. of Vladimir Zlobinsky [hereinafter "Apr. 20 Dec."]. The Federal Arbitrazh Court ultimately concluded that SMS's registration was invalid because its charter contained claims that it received state—owned property from the lease enterprise—a transfer to which the state, as owner of the property, never consented. However, in reaching this result, the decision appears to focus on tangible property that passed under the lease agreement, rather than on the studio's copyrights and other intangible property. At the outset of the opinion, the court summarizes what it takes to be the reasoning of the lower court with respect to the transfer of Soyuzmultfilm Studio's intangible rights:

The Court found the provision in the Charter [of SMS] as to the succession of all intangible rights (including copyrights) from the leased enterprise to be legally correct. The court noted that based on Article 16 of the Basic Law of Leasing, the copyrights for production of [Soyuzmultfilm Studio] films, including intangible, were transferred to the leased enterprise, which is the successor in interest with respect to all rights of the leased state enterprise. Because the succession to the rights is based in law (Article 486 [19] of the Civil Code of the former Russian Soviet Federative Socialistic Republic, Article 58 of the Civil Code of the Russian Federation), it cannot be limited by lease agreement. *Id.* at 4.

Immediately following this summary of the lower court's decision, the Federal Arbitrazh Court for the District of Moscow states that "[t]he conclusions of the court are incorrect and are based on improper application of the norms of substantive law." *Id.* at 5. However, in the ensuing discussion, the court at no point explains why the lower court's analysis of the copyright transfer from the state enterprise to the lease enterprise, and thereafter to SMS, is incorrect. Instead, the Federal Arbitrazh Court focuses on the disposition of the state's tangible property. *See Films by Jove*, 154 F.Supp.2d at 474–75. "According to the property transfer act," the court remarks, "there was transferred to the joint stock company the *tangible* assets owned by the state for separate accounting as state property in accordance with Annex No. 2." Apr. 20 Dec. at 6

---

19. Actually, it is Article 498 that provides for the transfer of copyrights by operation of law to a legal successor upon the reorganization of a commercial entity. Article 486 is the provision that vests the ownership of copyrights for a film in the entity that produced the film.

(emphasis added). However, the court reflects, the charter of the lease enterprise acknowledged that the tangible property leased from the state would remain in state ownership. Therefore, that property could not be transferred without the approval of the state, through its agency, the Property Ministry. The Property Ministry's consent was never obtained, however. *See id.* On this basis, the court concluded that the lease enterprise improperly disposed of state property by transferring it to the joint stock company and, accordingly, the joint stock company's registration "must be deemed invalid as made in violation of law and interests of the state as owner of the property transferred to the joint stock company." *Id.*

Thus, on remand, the FSUESMS-initiated suit ended with the invalidation of SMS's registration but did not clearly resolve the copyright ownership question currently before this court.[20]

### (b) SMS's Suit Against FSUESMS on Remand

### Moscow Region Arbitrazh Court: January 25, 2001

Meanwhile, another series of decisions was emerging on remand in the suit initiated by SMS. In the first of these cases, a month after the December 26 decision upholding SMS's registration, the Moscow Region Arbitrazh Court refused to cancel FSUESMS's registration. The reasoning of this decision echoes some of the arguments propounded by defendants in the present dispute. For one thing, the court concluded—in direct contradiction to its December 26 decision—that the Soyuzmultfilm lease agreement did not effect the conversion of the state enterprise into the lease entity:

> This Court believes that the state-owned enterprise Soyuzmultfilm Studios was never transformed into a lease-holding enterprise as such because Article 16 of the USSR Fundamental Legislation on Leasing provides for no such transformation. Transformation provides, above all, for ownership of the assets of the reorganized enterprise to be transferred to the newly established enterprise. That never took place because, following the establishment of the lease-holding enterprise, the physical assets of the state-owned enterprise ... remained state property and remain such to this day.

Jan. 25, 2001 Dec., attached to Feb. 8, 2002 Letter of Julian Lowenfeld [hereinafter "Jan. 25 Dec."] at 3.

According to the January 25, 2001 decision, rather than transforming the state enterprise into a lease enterprise, the lease agreement simply resulted in "the transfer of all the employees of the state-owned enterprise to the leaseholders' organization[21] and, subsequently, to the [lease enterprise] and the joint-stock company." *Id.* Referring to the emergence of FSUESMS in June 1999, the court concluded that "the State, in the person of a properly authorized agency, is entitled, upon termination of the Lease Agreement, to recruit new employees and to make a decision to resume the activities of the

---

**20.** Plaintiffs initially advised this court of SMS's intent to seek review of the Federal Arbitrazh Court's April 20 decision from the High Arbitrazh Court—at one point suggesting that the April 20 decision had been stayed. *See* Tr. of June 5, 2001 Oral Arg. at 10, 66. However, plaintiffs have presented no further evidence to substantiate this claim.

**21.** The "leaseholders' organization" (translated elsewhere as the "organization of lessees") is a group consisting of employees of a state enterprise. It is formed solely for the purpose of signing a lease agreement with the state.

state-owned enterprise on the basis of the state-owned physical assets." *Id.*

Acknowledging that "[a]ccording to paragraph 4 of Article 16 of the USSR's Fundamental Legislation on Leasing, a lease-holding enterprise becomes the successor to the property rights and responsibilities of the appropriate state-owned enterprise," *id.* at 2, the court concluded that this succession of rights would not extend beyond the lease term:

> [W]hether a lease-holding enterprise becomes a successor to a state-owned enterprise depends on the existence of a lease agreement. A lease-holding enterprise is a successor to a state-owned enterprise only to the extent that it lawfully possesses (holds on lease) the physical assets of a state owned enterprise, and, while having them in its possession, it can exercise the rights and perform the responsibilities of the state-owned enterprise.
>
> Therefore, legal succession from a state-owned enterprise to a lease-holding enterprise provided for in point 4 of Article 16 ... results not from the transformation of the former into the latter, as the Plaintiff believes, but from the existence of an agreement for the lease of the physical assets of the enterprise....
>
> Being based on a lease agreement, such succession is of temporary nature and is limited by the duration of the said agreement.
>
> The lease-holder cannot continue to be the legal successor to a state-owned enterprise upon termination of the Lease Agreement because, in that situation, the lease-holder must return the leased property to the state....

*Id.*

### Moscow Region Arbitrazh Appeals Court: April 3, 2001

On appeal, the decision not to cancel FSUESMS's registration was upheld. However, the appellate court, in a ruling issued on April 3, 2001, reversed the lower court's reasoning regarding the operation of the lease agreement and its effect on the succession of rights from the state enterprise to the lease enterprise. *See* Apr. 3, 2001 Dec., Ex. B, attached to Decl. of Anya Zontova [hereinafter "Apr. 3 Dec."]. More specifically, the appeals court rejected the conclusion that the succession of rights provided for in Article 16 of the Soviet leasing legislation "was based on the lease agreement, has a temporal nature and is restricted by the term of such agreement." *Id.* at 4. The appeals court found that

> [t]he succession of rights is tightly linked with the legal capacity of a legal entity. It is an integral property of a legal entity, not of a leased property complex. Therefore when the property is returned after the agreement ended, there is no automatic return of the succession of rights and obligations.

*Id.* at 5.

The appeals court further rejected the related proposition that the formation of FSUESMS in 1999 amounted to a "resumption of activity of the state enterprise," and specifically held that the state enterprise Soyuzmultfilm Studio ceased to exist in 1989 when it was transformed into the lease enterprise:

> The fact of signing the lease agreement determines the formation of a lease enterprise. As it takes place, the activity of the state enterprise ceases through the conversion resulting from the formation of a lease enterprise on the basis of a state enterprise (Article 16 of the Fundamentals on Leasing.)

> Thus, after signing the agreement of December 20, 1989 ... the state enterprise ceased. By operation of law, the

successor of rights of this enterprise became the lease enterprise ..., which was later converted into the joint stock company.

*Id.* at 4–5.

Although the April 3 decision reversed the lower court's reasoning that SMS's rights were dependent on the terms of the lease agreement, it nevertheless confirmed the validity of FSUESMS's registration. Acknowledging that SMS had inherited certain rights of the state enterprise, which it continued to possess after the expiration of the lease term, the court held that the registration of the "newly formed" FSUESMS did not violate SMS's rights because FSUESMS's charter did not specifically stipulate that it had inherited the rights of the state enterprise. *See id.* at 5. A lone reference, in Item 1.1 of the FSUESMS charter, to the Order of 1936, which had created the state enterprise Soyuzmultfilm—though presumably intended as an assertion that FSUESMS was a continuation of the original film studio—did not, according to the court, provide sufficient cause to nullify the registration. *See id.*

### Federal Arbitrazh Court for the District of Moscow: June 4, 2001

Both SMS and FSUESMS appealed the April 3, 2001 appeals court decision to the Federal Arbitrazh Court for the District of Moscow: the former seeking reversal of the result of that decision, i.e., the refusal to cancel FSUESMS's registration; the latter challenging the appeals court's reasoning concerning succession of rights under the Soviet leasing law. *See* June 4, 2001 Dec., Ex. A, attached to Decl. of Anya Zontova [hereinafter "June 4 Dec."] at 3. Though these appeals were made to the same court that issued the April 20, 2001 ruling, overturning the lower court decisions in the suit initiated by FSUESMS,

and canceling the joint stock company's registration, this time the court denied both appeals and upheld the reasoning and outcome of the April 3, 2001 ruling. *See id.* at 5. The Federal Arbitrazh Court explicitly affirmed that "after signing the lease agreement, the activity of the [state enterprise Soyuzmultfilm studio] ceased," and that FSUESMS was created in 1999, not as a continuation of the former state enterprise, but rather as "a new legal entity." *Id.* at 4.

### (5)

### Oral Argument Before This Court on Cross–Motions for Summary Judgment: June 5, 2001

In the meantime, as the litigation between SMS and FSUESMS proceeded in Russia, on June 5, 2001, a day after the Federal Arbitrazh Court for the District of Moscow issued its decision in the SMS-initiated suit, this court held a previously scheduled oral argument on the parties' cross-motions for summary judgment. During that argument, all the parties expressly agreed that they did not wish to await the outcome of any further appeals in the Russian litigation before proceeding to decision. *See* Tr. of June 5, 2001 Oral Arg. at 65–67. Consequently, at the time of this court's August 27, 2001 decision, the overall results of the Russian litigation appeared decidedly in plaintiffs' favor.

First, there was the December 26, 2000 decision of the Moscow Region Arbitrazh Court on remand in the FSUESMS-initiated suit, which directly addressed the issue of copyright ownership, and which "more or less, adopted virtually every aspect of plaintiffs' theory of the case." *Films by Jove,* 154 F.Supp.2d at 470–71. The Federal Arbitrazh Court for the District of Moscow reversed the December 26, 2000 decision, on April 20, 2001, in a ruling that invalidated SMS's corporate registra-

tion. However, that opinion focused on claims in the joint stock company's charter that it had received *tangible* property from the lease enterprise, without any indication that the owner of that property, the state, had consented to the transfer. The impact of the April 20 decision was further undermined by the April 3, 2001 and June 4, 2001 decisions in the suit initiated by SMS. Importantly, the latter of those two decisions was rendered by the same court that issued the April 20 ruling, and it postdated that decision. Both the April 3 and June 4 opinions confirmed plaintiffs' contention that the state enterprise ceased to exist upon execution of the lease agreement, and, furthermore, that the agreement effected the transformation of the state enterprise into the lease enterprise. Both of those courts also found that while the material assets of the former state enterprise had to be returned to the state when the lease expired in 1989, the other "rights and obligations," presumably including copyrights, that passed to the lease entity as a legal successor to the state enterprise, survived the lease term and were properly transferred to SMS.

### (6)

### This Court's Ruling in Favor of Plaintiffs: August 27, 2001

On August 27, 2001, this court granted summary judgment in favor of the plaintiffs, concluding that: 1) the copyrights in Soyuzmultfilm Studio's animated films belonged *ab initio* to the studio itself, rather than to the Soviet state; 2) these rights were transferred to the lease enterprise by operation of law in 1989, when the state enterprise was transformed into the lease enterprise and ceased to exist; 3) Perestroika reforms solidified the lease enter-

prise's rights of commercial exploitation in its copyrights; 4) accordingly, in 1992, the lease enterprise entered into a valid licensing agreement with FBJ, granting FBJ exclusive international distribution rights in Soyuzmultfilm Studio's animated films; and 5) the underlying copyrights, subject to FBJ's license, passed in 1999 to SMS, when the lease enterprise was reorganized as a joint stock company, still bearing the Soyuzmultfilm Studio name.

### (7)

### Presidium of the High Arbitrazh Court for the Russian Federation: December 18, 2001

On December 18, 2001, some four months after this court's August 27, 2001 decision, the Presidium of the High Arbitrazh Court for the Russian Federation issued a ruling overturning the reasoning of the April 3, 2001 decision of the Moscow Region Arbitrazh Appeals Court, and the June 4, 2001 decision of the Federal Arbitrazh Court for the District of Moscow. *See* Dec. 18, 2001 Dec., attached to Feb. 8, 2002 Letter of Julian Lowenfeld [hereinafter "Dec. 18 Dec."]. Again, the High Court's opinion does not explicitly address the issue of copyright ownership. In fact, as plaintiffs correctly point out, the word copyright appears nowhere in the opinion.[22] *See* Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Recons. [hereinafter "Pls.' Opp'n to Recons."] at 5. The central issue in that litigation was the validity of FSUESMS's corporate registration. However, the High Arbitrazh Court did reach relevant conclusions regarding legal succession under the Fundamental Principles on Leasing—the same law under which plaintiffs have previously persuaded this court that the execution of the Soyuz-

---

**22.** The same, of course, might be said of the April 3 and June 4 decisions, which, unlike the December 26, 2000 opinion in the FSUESMS-initiated litigation, did not specifi-

cally address the question of copyright ownership, instead focusing on the issue of corporate succession.

multfilm lease agreement in 1989 effected the transformation of the state enterprise film studio into the lease enterprise, triggering the transfer of the disputed copyrights to the lease enterprise by operation of law.

The High Arbitrazh Court begins by noting that the First Deputy Prosecutor General of the Russian Federation officially protested the April 3, 2001 and June 4, 2001 rulings, requesting that the court "exclude" several conclusions from the "motivational part," i.e., the reasoning, of those decisions.[23] Specifically, the state prosecutor asked the High Arbitrazh Court to reverse the lower courts' conclusions:

> [1] about the state enterprise [Soyuzmultfilm Studio] being converted into a lease enterprise; [2] [that] the succession of rights of the lease enterprise based on the lease agreement is not restricted by the term of the agreement[; and] [3] [that SMS] is a legal successor of the state enterprise [Soyuzmultfilm Studio].[24]

Dec. 18. Dec. at 2.

The High Arbitrazh Court ruled that the disputed court acts would be "canceled," and that the January 25, 2001 decision of the Moscow Region Arbitrazh Court would be left in effect:

> The Appeals Court made the conclusion that the activity of the state enterprise [Soyuzmultfilm Studio] ceased through the conversion into a lease enterprise and that the succession of rights of the lease enterprise based on the lease agreement is not restricted by the term of such agreement.
>
> This conclusion is made as a result of the wrong interpretation of law by the court.

*Id.*

In explaining the "grounds" for its conclusions, the court offered an interpretation of Article 16 of the "Fundamental Principles of Legislation of the USSR and Union Republics on Lease," the Soviet legislation governing the formation of lease enterprises. Like the January 25 decision that it reinstated, the High Court concluded that the relevant provisions of the leasing statute did not provide for the conversion of a state enterprise into a lease entity, and furthermore that any succession of rights from a state enterprise to the lease entity would not survive the expiration of the lease term.

> Pursuant to Item 1, Article 16 of the Fundamentals of USSR and Soviet republics law on Leasing, not a state enterprise but an independent legal entity—such as an organization of lessees created by a labor collective of a state enterprise—is converted into a lease en-

---

**23.** FSUESMS's Russian law expert, Professor Peter B. Maggs, explains that to secure review of a lower court decision by the High Arbitrazh Court, the Prosecutor General or Deputy Prosecutor General must register a formal "protest" of that decision. Interestingly, the Chairman or Deputy Chairman of the High Court is likewise empowered to initiate review by protesting a lower court opinion. It appears that the most the parties themselves can do to obtain High Court review is petition those individuals empowered by Russian law to lodge a formal protest. *See* Maggs 9th Supp. Decl. ¶ 39. *See also* Reynolds, *Handbook on Commercial Dispute Resolution in the Russian Federation, supra,* at 102.

**24.** Plaintiffs and defendants have each submitted their own translation of the High Arbitrazh Court's December 18, 2001 ruling. Although there are, understandably, minor variations in wording between the two translations, the parties have agreed that these difference are of no material legal significance. *See* Tr. of Apr. 9, 2002 Oral Arg. at 4. Inexplicably, however, defendants' translation apparently omits several paragraphs of the opinion. *See* Supp. Decl. of Paul B. Stephan, Mar. 21, 2002 [hereinafter "Stephan Supp. Decl., Mar. 21, 2002"] ¶ 2 n. 1. Thus, in the interest of consistency, I will quote from plaintiffs' translation, which appears to be the only complete translation available to the court.

terprise. The organization of lessees obtains the status of a lease enterprise after signing a lease agreement.

Pursuant to Item 4, Article 16 of the Fundamentals, a lease enterprise becomes a successor of property rights and obligations of the state enterprise leased by it. Because a lease is a possession and use for a fixed period of a property complex (Article 1 of the Fundamentals), this succession of rights is restricted by the term of the lease agreement.

*Id.*

The court proceeded to rule that the Federal Arbitrazh Court for the District of Moscow erred in determining that the joint stock company is a successor to the original state enterprise Soyuzmultfilm Studio founded in 1936:

> The property complex leased under the said agreement, was not privatized and after the formation of the joint stock company it remained state property. Pursuant to the Order of the Russian Federation Government of June 30, 1999 ..., the property of [Soyuzmultfilm Studio] which is in state property, is used for the formation on its basis of an enterprise to which it is assigned to under the right of economic management by Order of the Ministry of State Property of October 8, 1999.... With the expiration of the lease agreement, the plaintiff had no further legal grounds for the use of rights and property obtained under this agreement.

> Thus the Lower Court's conclusion that the company is not the successor of the state enterprise ... is well-grounded and complies with the case materials.

*Id.*

## Discussion

### (1)

■ Under Rule 60(b)(2) of the Federal Rules of Civil Procedure, a party may move for reconsideration of a final order or judgment on the basis of "newly discovered evidence that could not have been discovered earlier and that is relevant to the merits of the litigation." *Hemric v. City of New York*, 96–CV–0213, 2002 WL 1203850, at *2 (S.D.N.Y. June 3, 2002) (citing *Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 54 (2d Cir.1993)(per curiam)). Such motions, however, are "generally not favored," *United States v. International Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir.2001), and may not be used "solely to relitigate an issue already decided." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.1995); *accord PAB Aviation, Inc. v. United States*, 98–CV–5952, 2000 WL 1240196, at *1 (E.D.N.Y. Aug.24, 2000); *Resource N.E. of Long Island v. Town of Babylon*, 80 F.Supp.2d 52, 64 (E.D.N.Y.2000).

■ Defendants and FSUESMS base their joint motion for reconsideration on two foreign court rulings handed down shortly after this court's August 27, 2001 order granting summary judgment to the plaintiffs, *viz.* the October 2, 2001 decision of the Paris Court of Appeals, and, more significantly, the December 18, 2001 decision of the High Arbitrazh Court of the Russian Federation. Fundamentally, the motion requires this court to determine: 1) whether the December 18, 2001 ruling of the High Arbitrazh Court and the October 2, 2001 decision of the Paris Appeals Court materially contradict the interpretations of Soviet law underpinning this court's previous order; and, if so, 2) whether, and to what extent, this court is required to, or should, defer to those courts' legal conclusions.

### (2)

According to defendants, the significance of the Paris Appeals Court's October

2, 2001 decision lies in the court's conclusion that, under Russian law, Sovexportfilm retained exclusive commercial distribution rights for films produced by Soviet film studios, including Soyuzmultfilm Studio, during the period of state ownership. See Mem. of Law of Defs. and 3D-Party Pl. in Supp. of Jt. Mot. for Recons. and Modification [hereinafter "Defs.' Mem. for Recons."] at 11; Oct. 2, 2001 French Dec. at 25–26. Were this court to accept that premise, it would follow that the international copyright license the lease enterprise granted to FBJ in May 1992 was invalid.[25] However, defendants offer no compelling basis for deferring to the Paris Appeals Court's conclusions. As an initial matter, defendants grossly exaggerate the importance of the Paris Appeal Court's reversal of the June 19, 1996 ruling in favor of FBJ by suggesting that the now-overruled decision was "relied on as 'definitive'" in this court's August 27, 2001 decision. Defs.' Mem. for Recons. at 11. In fact, that decision was only mentioned in passing in the background section of the August 27 opinion, by way of summarizing plaintiffs' account of the history of Soyuzmultfilm Studio. *See Films by Jove,* 154 F.Supp.2d at 435; *see also id.* at 438 (reiterating that the section of the opinion containing, *inter alia,* the reference to the Sovexportfilm litigation in France constitutes "plaintiffs' version of the facts"). At no point in the ensuing discussion, did this court refer to—much less rely upon—the June 19, 1996 decision.

Noting that both plaintiffs in this case were parties to the French litigation, which turned on the same Soviet laws as this court's August 27, 2001 decision, defendants contend that principles of international comity favor deference to the Paris Appeals Court's findings. *See* Defs.' Mem. for Recons. at 12–14. Although they do not explicitly refer to the doctrine, the result defendants apparently seek is akin to issue preclusion. The argument would be that because FBJ and SMS had an opportunity to litigate the issue of copyright ownership before the French courts, in litigation that commenced prior to the initiation of proceedings before this court, and the Paris Appeals Court has now determined that exclusive distribution rights for the disputed Soyuzmultfilm Studio films belonged to the state, plaintiffs should be precluded from reasserting their rights in the films in this forum.

■ "It is well-established that United States courts are not *obligated* to recognize judgments rendered by a foreign state, but may *choose* to give res judicata effect to foreign judgements on the basis of comity." *Gordon & Breach Sci. Publishers S.A. v. American Inst. of Physics,* 905 F.Supp. 169, 178–79 (S.D.N.Y.1995). At the same time, "[t]he law is unsettled ... as to what exactly 'comity' entails; thus it is primarily principles of fairness and rea-

---

**25.** In the October 2, 2001 decision, the Paris Appeals Court appears to be under the impression that Sovexportfilm's exclusive foreign distribution rights remained in effect until the Russian Federation passed its law "on copyrights and collateral rights" in 1993. Oct. 2, 2001 French Dec. at 26. The appeals court also refers to an official document, dated September 16, 1992, apparently granting certain distribution rights to Soyuzmultfilm Studio. *See id.* at 25–26. The record in this case, however, demonstrates that Sovexportfilm lost its export monopoly in 1988, and that Soyuzmultfilm Studio gained the right to market its films abroad on September 19, 1989. In fact, the Paris Appeals Court made precisely these findings in its 1997 decision in favor of FBJ and the lease enterprise Soyuzmultfilm Studio. *See* Sept. 12, 1997 French Dec. at 12 ("[A]ccording to the letter of confirmation dated September 19, 1989, [Soyuzmultfilm] Studio enjoyed the right to market any films from its production[.] [H]ence[,] ... it may not be claimed that it was only starting from September 16, 1992 that the [studio] enjoyed the exclusive right to sell in foreign markets.").

sonableness that should guide domestic courts in their preclusion determinations." *Id.* at 179; *accord Alesayi Beverage Corp. v. Canada Dry Corp.*, 947 F.Supp. 658, 664 (S.D.N.Y.1996), *aff'd mem.*, 122 F.3d 1055 (2d Cir. 1997). In this case, the October 2, 2001 decision of the Paris Appeals Court is not entitled to, any such preclusive effect. For one thing, the decision is not the Paris Appeals Court's only ruling on the issue. In fact, in the first suit filed against Sovexportfilm that court ruled in favor of plaintiffs, expressly upholding the validity of FBJ's exclusive copyright license. *See* Sept. 12, 1997 French Dec. at 14 (finding that FBJ was "entitled and justified in its claims of copyright infringement"). Moreover, the Paris Appeals Court's earlier ruling has been affirmed by the court of last resort, the French High Cassation Court, while the more recent inconsistent decision is currently on appeal, according to plaintiffs.[26]

More importantly, it remains the conclusion of this court, based on documents submitted by plaintiffs' experts, despite any contrary findings of the Paris Appeals Court, that Goskino in fact divested Sovexportfilm of its export monopoly in an order dated March 14, 1988, and that, one year later, a Decree of the U.S.S.R. Council of Ministers pronounced that Goskino had no rights with respect to the export of films belonging to state studios. Accordingly, on September 19, 1989, three months before the lease agreement was executed, Soyuzmultfilm Studio, still operating as a state enterprise, received a license from the U.S.S.R. Ministry of Foreign Economic Relations to exploit its film library through direct contracts with foreign parties. *See* Decl. of Paul B. Stephan, Jan. 22, 2001 [hereinafter "Stephen Decl., Jan. 22, 2001"] ¶ 4, and accompanying exs.

Plaintiffs represent that their French attorneys, in what would appear to amount to blatant professional malpractice, failed to present evidence of these acts to the Paris Appeals Court. *See* Borsten Decl. in Opp'n to Recons. ¶¶ 12–16. The absence of such evidence could account for the conclusions reached in the October 2, 2001 decision. In the end, however, there is no need to speculate about the basis for the Paris Appeals Court's decision. Because the present dispute requires resolution of complex issues of Russian law, this court is not bound to give effect to the legal interpretation of a French court. Moreover, I am especially disinclined to do so when that interpretation is contradicted by an earlier ruling of the same court, upheld by the court of last resort, in a suit involving the same parties and identical legal issues, and, more significantly, when the interpretation appears very obviously mistaken based on the more probative evidence of Russian law furnished to this court by plaintiffs' experts.

(3)

■ Before reaching the merits of defendants' arguments with regard to the

---

**26.** I am mindful of the traditional conflict of laws rule under which the later of two inconsistent judgments generally governs. *See, e.g.,* Restatement (Third) of Foreign Relations Law § 482, cmt. g (1987) ("Courts are likely to recognize the later of two inconsistent foreign judgments."). However, this rule apparently rests in part on the presumption that the later court will have already considered the preclusive effect of the earlier ruling. *See Gordon & Breach Sci. Publishers*, 905 F.Supp. at 179 n. 9 (citing Hans Smit, *International Res Judicata and Collateral Estoppel in the United States*, 9 UCLA L.Rev. 44, 46 n. 13 (1962)). Here, such a presumption clearly does not obtain. The irreconcilable judgments reached by the Paris Appeals Court are obviously the result of a legal system that does not recognize the preclusive effect of prior judgments (at least not in the sense that an American court would), otherwise one expects that the final ruling of the French High Cassation Court in the first infringement suit would have precluded Sovexportfilm from reasserting, in the second suit, its claim to have retained monopoly rights under Russian law for the foreign distribution of films produced by Soviet film studios.

December 18, 2001 decision of the High Arbitrazh Court, one preliminary issue must be addressed: whether the parties stipulated at the June 5, 2001 oral argument to be bound by an immediate ruling, without awaiting the results of potential future appeals in the FSUESMS–SMS litigations then pending before the Russian arbitrazh courts. Plaintiffs argue that all the parties so stipulated, and that defendants' motion for reconsideration is, therefore, barred insofar as it is predicated on an arbitrazh court decision post-dating the stipulation. *See* Pls.' Opp'n to Recons. at 2 n. 1. Defendants counter that although the parties agreed that this court should resolve the parties' cross-motions without waiting for a final outcome in the Russian litigation, defendants did not intend to waive their right to move for reconsideration in the event that subsequent Russian court decisions materially contradicted this court's conclusions as to matters of Soviet law. *See* Defs.' Mem. for Recons. at 3.

The issue is complicated somewhat by the fact that at the June 5, 2001 oral argument, the parties did not foresee, or at least did not address, the possibility that the High Arbitrazh Court might eventually intervene in the SMS-initiated suit. The Federal Arbitrazh Court for the District of Moscow, the appellate court immediately below the High Arbitrazh Court, issued an opinion in that litigation on June 4, 2001. As it turned out, the High Arbitrazh Court ultimately reviewed the June 4 decision, resulting in the December 18, 2001 ruling. In all likelihood, however, the parties were not aware of the June 4 decision at oral argument—it having been issued only a day earlier. At the very least, the case was not discussed, and it appears that this court was not appraised of the June 4 decision until it was submitted in translation later that month. *See* Decl. of Anya Zontova.

Instead, at the June 5, 2001 oral argument, the possibility of High Court intervention was raised when plaintiffs represented that the April 20, 2001 decision of the Federal Arbitrazh Court for the District of Moscow—the decision in the FSUESMS-initiated litigation that invalidated SMS's registration—had been stayed and that SMS was in the process of appealing the decision. *See* Tr. of June 5, 2001 Oral Arg. at 10, 66. As to the April 20 decision, plaintiffs and defendants expressly agreed that this court should not delay its decision in anticipation of future appeals. *See id.* at 65–67.

It is curious that defendants would encourage this court to issue a ruling without waiting for the Russian litigation to reach a definitive conclusion if counsel in fact believed that future decisions from the Russian courts might require that ruling to be vacated. Nonetheless, defendants do not appear to have explicitly disclaimed reliance on future arbitrazh court decisions. On the contrary, referring to the April 20 decision, defense counsel conceded that "if this decision were appealed to the highest court in Russia ... and it went against us, we're bound by that decision." *Id.* at 62. In any event, I will proceed to consider the merits of defendants' motion with respect to the High Arbitrazh Court's December 18, 2001 decision.

(4)

■ Defendants argue that the December 18, 2001 decision categorically rejects fundamental conclusions of Russian law underlying this court's August 27, 2001 decision granting summary judgment to the plaintiffs, and, therefore, warrants reconsideration of that opinion. FSUESMS's expert, Professor Maggs, points out that the High Arbitrazh Court is the "court of last resort" in the Russian legal system for commercial disputes. *See*

Maggs 7th Supp. Decl. ¶ 7. Because there is no higher court to which SMS can appeal, defendants view the December 18, 2001 decision as definitive proof that this court was "thoroughly misled by [p]laintiffs' arguments, premised on certain fundamental conclusions which the High Arbitrazh Court has now refuted." Defs.' Mem. for Recons. at 11. Defendants argue that the High Court's decision provides "dispositive and unappealable Russian legal authority" refuting plaintiffs' claim to the copyrights in Soyuzmultfilm Studio's Soviet-era films. *Id.* As a result, defendants contend, plaintiffs lack standing to pursue their infringement action against Berov, and this court should, accordingly, vacate the previous order and issue a new order, dismissing plaintiffs' claims with prejudice. *Id.*

Disputing defendants' contention that the December 18, 2001 decision of the High Arbitrazh Court warrants reconsideration, plaintiffs first argue that this court's August 27, 2001 decision "did not rely on any Russian decisions and found that all prior decisions were irrelevant because none of the decisions had ruled on issues relating to copyright." Pls.' Opp'n to Recons. at 5. Because the December 18, 2001 decision was simply an appeal of earlier Russian decisions that this court previously considered, plaintiffs assert that it is likewise irrelevant and thus, whatever its holding, does not warrant reconsideration of the August 27, 2001 decision. *See id.*

Although my ruling did not treat any Russian opinion as conclusive or dispositive, the characterization of the arbitrazh court decisions as "irrelevant" surely overstates the case. At the very least, the December 26, 2000 decision by the Moscow Region Arbitrazh Court expressly ruled on

the issue of copyright ownership, by and large adopting plaintiffs' theory of the case. *See Films by Jove,* 154 F.Supp.2d at 470–71; *see also* Feb. 22 Dec. at 6 (finding that "copyrights to animated films created by the state enterprise ... passed on to the successor of its rights, the lease enterprise"). The decisions on remand in the SMS-initiated litigation did not expressly reach the question of copyright ownership, but they did address, in general terms, the succession of rights from the state enterprise Soyuzmultfilm Studio—an issue that is hardly irrelevant to the instant dispute, considering that plaintiffs' primary claim to ownership of the Soyuzmultfilm copyrights depends on the premise that the lease enterprise succeeded to the rights of the state enterprise by operation of law upon execution of the lease agreement in 1989.

Defendants first argue that the High Arbitrazh Court's decision negates this court's conclusion that the creation of the lease enterprise terminated the existence of the state enterprise. *See Films by Jove,* 154 F.Supp.2d at 476 n. 40 (concluding that the state enterprise "ceased to exist in 1989"); *id.* at 480 (same). According to defendants, the continued existence of the state enterprise after 1989 bolsters the contention that FSUESMS is a continuation of the original Soyuzmultfilm Studio and the true inheritor of whatever property interest the state enterprise had in the copyrights to its films.[27] Moreover, plaintiffs' theory that the copyrights passed to the lease enterprise by operation of law under Article 498 of the Soviet Civil Code depends on the transformation of the state enterprise into the lease enterprise. Such a transformation could not have occurred, however, if the state enterprise maintained

---

**27.** Defendants assert that the state was and continues to be the owner of the copyrights for the films produced during the Soviet peri-

od. FSUESMS claims to possess only a limited right of "operative management" in the films.

an independent existence after the lease enterprise came into existence.

In its review of the lower courts' reasoning, the High Arbitrazh Court explains: "[t]he Appeals Court made the conclusion that the activity of the state enterprise ... ceased through the conversion into a lease enterprise and that the succession of rights of the lease enterprise based on the lease agreement is not restricted by the term of such agreement." Dec. 18 Dec. at 2. However, in the opinion of the High Court, "[t]his conclusion is made as a result of the wrong interpretation of law by the court." *Id.* Thus, the December 18 decision appears to reject the premise that the state enterprise ceased to exist after the execution of the lease agreement—albeit without offering any explanation of what happened to the state enterprise during the ten–year lease term if it was not, as this court previously held, transformed into the lease enterprise.

Plaintiffs counter that, properly read, the December 18, 2001 opinion does not hold that the state enterprise remained in existence following the formation of the lease enterprise. Their argument apparently rests on a close reading of the excerpts quoted above. The High Arbitrazh Court initially refers to two conclusions of the appeals court—the first regarding the cessation of the state enterprise's activity, and the second concerning the succession of rights under the lease agreement—but, ultimately, the High Court rejects "this conclusion," in the singular. *See* Tr. of Apr. 9, 2002 Oral Arg. at 51–52. Thus, Professor Paul B. Stephan, one of plaintiffs' principal Soviet law experts, contends that "the [High] Arbitrazh Court did not

assert ... that [the state enterprise] remained in existence after the creation of [the lease enterprise]." Stephan Supp. Decl., Mar. 21, 2002 ¶ 5. Rather, according to Professor Stephan, the "wrong interpretation of law" to which the court referred concerned only the second conclusion about succession of rights under the lease agreement.[28]

Considering the challenge inherent in construing opinions translated from Russian, it is difficult to evaluate arguments that rest on such fine parsing of the court's language. However, reading this excerpt in the context of the opinion as a whole—and in conjunction with the lower court decision of January 25, which it reinstated—suggests that the High Arbitrazh Court did intend to rule that the establishment of the lease enterprise Soyuzmultfilm Studio did not terminate the existence of the original state enterprise. As discussed below, the court unequivocally overruled the finding that the state enterprise was converted into the lease enterprise. Although the opinion does not explain the status of the state enterprise during the lease term, the explicit determination that no transformation occurred strongly suggests that, despite any ambiguity in the language, the "wrong interpretation of law" referenced by the High Arbitrazh Court encompassed the conclusion that the state enterprise ceased to exist upon execution of the lease agreement.

However, given defendants' concession that, during the lease term, the state enterprise had no office, no equipment, no staff, indeed no tangible property at all, and thus, unsurprisingly conducted no business from 1989 to 1999, the conclusion

---

**28.** Furthermore, Professor Stephan asserts that the High Court's discussion of legal succession has nothing to do with intangible rights that passed by operation of law, but only with tangible rights leased from the state under the agreement with Goskino. Howev-

er, as will be discussed shortly, the limitation Professor Stephan seeks to impose on the scope of the High Arbitrazh Court's ruling, while of some initial appeal, is ultimately untenable.

that the *activity* of the state enterprise did not cease during this period seems entirely counterfactual. The court may be indicating that the state enterprise continued its legal existence during the lease period, in a state of "suspended animation," as defendants have suggested, Maggs 2d Supp. Decl. ¶ 11, even if, for all practical purposes, its operations had effectively ceased. On the other hand, plaintiffs' experts contend that it was not possible under Soviet law for an enterprise, having transferred substantially all its assets and personnel, to nevertheless subsist in some latent form for ten years. Professor Stephan explains that "Soviet legislation ... had elaborate formalities and requirements, involving registration, maintenance of a bank account, and tax filings, with which an enterprise had to comply to continue in existence." Supp. Decl. of Paul B. Stephan, June 20, 2001 [hereinafter "Stephan Supp. Decl., June 20, 2001"] ¶ 14. In the same vein, plaintiffs' expert Dr. Sergei Anatolievich Pashin [29] argues that upon transferring all its personnel, facilities, inventory, and equipment, pursuant the 1989 lease agreement, the state enterprise lost "all the qualities of the juridical person established by Article 23 of [the 1964 Civil Code]," including ownership of defined property and the ability to acquire rights and fulfill obligations. Decl. of Sergei Anatolievich Pashin [hereinafter "Pashin Decl."] ¶ 35. Moreover, because it was no longer functioning as "an independent commercial entity producing a product or providing services or labor," the state enterprise did not, according to Dr. Pashin, fall within the definition of an enterprise "contained in Part 1, Article 4 of the Law of the RSFSR of December 25, 1990." *Id.*

Defendants cite no evidence that suggests any practical signs of life on the part of the state enterprise after December 1989. Instead, they assert that, in 1999, FSUESMS filed an "amended charter" that revived the state enterprise in a new organizational form. Defendants' argument for the continued, albeit quiescent, existence of the state enterprise as an independent entity during the lease term might be strengthened, then, if the High Arbitrazh Court's opinion substantiated defendants' claim that, in 1999, FSUESMS simply picked up where the state enterprise had left off ten years earlier. Perhaps recognizing the significance of this issue, plaintiffs' expert Professor Stephan insists that "the [High] Arbitrazh Court did not assert (and no previous court in this litigation, including the January 25, 2001 decision of the Moscow [Region] Arbitrazh Court asserted) that [FSUESMS] became [the successor of the state enterprise] as a matter of law." Stephan Supp. Decl., Mar. 21, 2002 ¶ 5. The December 18, 2001 decision never expressly confirms the alleged continuity between FSUESMS and the original state enterprise Soyuzmultfilm Studio. In fact, the High Arbitrazh Court indicates that the "property complex" originally assigned to the state enterprise was used for the "formation" of FSUESMS, Dec. 18 Dec. at 3, language fully consistent with plaintiffs' contention, confirmed by the April 3 and June 4 decisions, that FSUESMS was not a successor to the original state enterprise Soyuzmultfilm Studio, but rather a newly-formed entity created to take over the tangible property formerly assigned to Soyuzmultfilm Studio.

Similar language appears initially in the now-reinstated January 25, 2001 decision

---

29. Dr. Pashin is a Russian legal scholar and former judge. His affidavit alleging improper conduct in the arbitrazh court proceedings leading up to the December 18 decision will be discussed in detail *infra*.

of the Moscow Region Arbitrazh Court. *See* Jan. 25 Dec. at 5 (referring to the June 30, 1999 "Instruction" of the Russian government, "which expressed the intention—due to expiration of the term of the lease in December 1999—to use the leased assets to *establish* a federal state-owned unitary enterprise") (emphasis added). On the other hand, the January 25, 2001 lower court opinion, expressly reinstated by the High Arbitrazh Court, later refers to the transfer of state-owned assets to FSUESMS as a legitimate decision by the state to "resume the activities of the state enterprise," *id.* at 3, which could be taken to imply a connection between FSUESMS and the original state enterprise. Similarly, the April 3 appeals court ruling, which initially overturned the January 25 decision, objected to the lower court's "conclusion about the resumption of activity of the state enterprise ... after the lease agreement ended, and returning to it the rights and obligations which have been passed on to the lease enterprise...." Apr. 3 Dec. at 5. This characterization of the January 25, 2001 decision, in particular the description of the rights and obligations "returning," would seem to presuppose that the state enterprise from which these rights were initially transferred still existed at the end of the lease term, presumably in the form of FSUESMS, in order to accept the return of its rights.

Defendants have also repeatedly pointed out that FSUESMS's charter indicates that it was founded in 1936, the year that the Soviet government created the original Soyuzmultfilm Studio. *See, e.g.,* 8th Supp. Decl. of Peter B. Maggs [hereinafter "Maggs 8th Supp. Decl."] ¶ 8 (indicating that FSUESMS "remains duly registered as being the same State Enterprise founded in 1936"); Defs.' Reply Mem. for Recons. at 5 ("All attempts by [SMS] to expunge the registration of [FSUESMS] as a 'continuation' of the 1936 state enter-prise have failed."); Tr. of Apr. 9, 2002 Oral Arg. at 8–9. Though such claims in an organization's charter are of course not dispositive of its legal rights, defendants observe that this charter, with its implicit claim of legal succession from the state enterprise, has been consistently, and, after the December 18 decision, conclusively, upheld, at least against allegations that it violates the rights of SMS.

The question of whether the state enterprise legally ceased to exist in 1989 bears on the relevance of an earlier pronouncement from the High Arbitrazh Court previously brought to this court's attention by FSUESMS's expert, Professor Maggs. *See* Reply Decl. of Peter B. Maggs [hereinafter "Maggs Reply Decl."] ¶ 5. In support of his argument that the copyrights to the films produced by the state enterprise Soyuzmultfilm Studio could not have passed to the lease enterprise through an automatic (and undocumented) succession by operation of law, Professor Maggs cited an Information Letter issued by the High Arbitrazh Court on September 28, 1999. *See id.;* Information Letter of the High Arbitrazh Court, Sept. 28, 1999 [hereinafter "Information Letter"], Ex. 1, attached to Maggs Reply Decl. Information Letters are essentially advisory opinions through which the High Court provides guidance to lower courts in the arbitrazh system, often by stating the facts and holdings of lower court decisions that were correctly decided, to indicate the High Court's approval of these decisions. *See* Maggs Reply Decl. ¶ 5. The lower courts are apparently expected to study the Information Letters and to follow the guidance offered or risk reversal. *See id.* According to Professor Maggs, the September 28, 1999 Information Letter, which dealt with the transfer of copyrights upon the reorganization of a film studio, rejected the possibility of automatic legal succession, holding instead that

" 'legal succession of enterprises is determined by the content of the property, rights, and obligations transferred by the statement (balance).' " *Id.* ¶ 7 (quoting Information Letter at 2). This language, Professor Maggs claimed, refuted plaintiffs' claim that the lease enterprise succeeded to ownership of the Soyuzmultfilm Studio copyrights by operation of law under Article 498 of the Soviet Civil Code.

The September 28, 1999 Information Letter "would be devastating to plaintiffs' case," *Films by Jove*, 154 F.Supp.2d at 468, if it meant, as Professor Maggs suggested, that the succession of rights following the reorganization of an enterprise was in all cases limited by the expressly delineated terms of the documents of transfer, since plaintiffs admit that the 1989 lease agreement did not purport to transfer any copyrights to the lease enterprise Soyuzmultfilm Studio.[30] However, in the August 27, 2001 decision, this court concurred with the arguments of plaintiffs' experts distinguishing the scenario discussed in the Information Letter from the type of reorganization that occurred in the case of Soyuzmultfilm Studio.

Put simply, the Information Letter cited by Professor Maggs dealt with a situation in which an independent film studio was "separated" or "spun off" from an existing state enterprise. *See* Information Letter at 1. Under this form of reorganization, the original state enterprise "continued to exist, with the exclusion of certain aspects of its activity in connection with the reorganization." *Id.* at 2. Because the original state enterprise and the "spin-off" were to conduct business simultaneously, "it would obviously be essential that there be a clear agreed-upon delineation of which assets of the parent enterprise were being transferred to the daughter enterprise." Reply

Decl. of Michael Newcity [hereinafter "Newcity Reply Decl."] ¶ 16. Moreover, "[t]here was no automatic succession by the daughter enterprise to the ownership of the parent's assets since the parent continued in existence." *Id.* In contrast, plaintiffs' experts argued, and this court agreed, the state enterprise Soyuzmultfilm Studio did cease to exist and was transformed into the lease entity. There was no need for an asset-by-asset itemization of the property transferred to the lease enterprise because the totality of the assets of the state enterprise passed to its successor, contemplating eventual privatization: all the tangible assets previously assigned to the state enterprise were transferred under the lease for a ten–year period, while the copyrights passed independently, and without limitation, by operation of law under Article 498 of the Soviet Civil Code.

Insofar as the December 18, 2001 decision suggests that the state enterprise did not cease to exist upon execution of the lease agreement, defendants argue that the grounds this court relied on in distinguishing the Information Letter—and its conclusion that no automatic succession to the copyrights is possible—are no longer viable. According to defendants, the December 18, 2001 decision "establishes beyond reasonable dispute that the parent (state) enterprise and the daughter (lease) enterprise did in fact exist simultaneously, that the parent did not cease to exist, and that the parent enterprise retained a continuing interest in at least *some* of its rights and property." Defs.' Reply Mem. for Recons. at 4. In further support of this conclusion, defendants point to Article 37 of the Soviet Law on Enterprises and Entrepreneurial Activity, previously cited by

---

**30.** Of course, plaintiffs argue that the lease agreement could not have transferred the copyrights. They maintain that the copyrights were owned by the studio, and thus the lessor, Goskino, lacked the authority to transfer them.

plaintiffs' expert, Professor Stephan. That provision indicates that "an organization shall be considered to be reorganized . . . from the moment it is removed from the lists of state registration." Defs.' Reply Mem. for Recons. at 4-5. Defendants argue that plaintiffs have made no showing that the state enterprise was ever removed from the registration lists prior to the registration of FSUESMS in 1999, which defendants characterize as an amendment to the charter of the original state enterprise Soyuzmultfilm Studio.[31] *See id.*

Although the December 18 decision of the High Arbitrazh Court does apparently instruct that the state enterprise did not cease to exist upon execution of the lease agreement, this continued existence, such as it was, did not implicate the concerns that appear to have motivated the Information Letter: namely, the need to sort out ownership interests between two simultaneously operating business entities. It is beyond dispute that between 1989 and 1999 the state enterprise did not operate a business in any meaningful way. As FSUESMS's counsel indicated at oral argument, during the lease period "all of the personnel, all of the . . . facilities, all of the cash flow coming from the Russian or Soviet government [went] to the Lease Enterprise and not to the State Enterprise," Tr. of Apr. 9, 2002 Oral Arg. at 18, and therefore, the state enterprise did not operate in any capacity during the lease term.

Importantly, the inactivity of the state enterprise was not limited to current film production. Defendants have made no showing that during the lease period the

supposedly extant state enterprise, or the state bureaucracy that would have been charged with managing its affairs, granted any licenses or took any other action with respect to the copyrights in Soyuzmultfilm Studio's library of animated films. The advisory opinion defendants cite dealt with a situation in which the original enterprise continued to operate, "with the exclusion of *certain aspects of its activity* in connection with the reorganization." Information Letter at 2 (emphasis added). Here, it is clear that for all practical purposes the 1989 lease agreement terminated *all* business activities of the state enterprise Soyuzmultfilm Studio, transferring the entirety of the studio's operations to the lease enterprise. Indeed, defendants have not (and cannot) point to a single official or unofficial act undertaken by or on behalf of the state enterprise between 1989 and 1999. *See Films by Jove*, 154 F.Supp.2d at 480. Thus, the Information Letter remains inapposite to the present case.

The Information Letter aside, defendants argue that the High Arbitrazh Court's December 18 ruling negates the premise that the state enterprise was transformed into the lease enterprise. In the August 27, 2001 decision, this court found that, pursuant to Article 498 of the 1964 Soviet Civil Code, "the disputed copyrights passed by operation of law . . . from the state entity to the lease entity upon the transformation of the former into the latter." *Films by Jove*, 154 F.Supp.2d at 472. Some form of "reorganization" is a necessary predicate to the applicability of Article 498, which provides: "*[i]n the case*

---

**31.** Plaintiffs have offered no direct response to this reading of Article 37, but it might be noted that it is not at all clear from the face of the provision whether it establishes a necessary or simply a sufficient condition for determining when the "reorganization" of an enterprise has taken place. It could well be that a *de facto* reorganization of the state enterprise occurred by virtue of the state enterprise having transferred to the lease enterprise all its assets and personnel and having ceased all business activities for a ten-year period. *See, e.g.,* the arguments of Professor Stephan and Dr. Pashin, discussed *supra* (arguing that a state enterprise could not continue to exist under these conditions).

*of the reorganization* of the organization which owns it, the copyright is transferred to its successor in title, and in the case of its liquidation, to the state." Newcity Decl. ¶ 55 (emphasis added). If, however, the lease agreement did not effect a reorganization of the state enterprise—or, more precisely, did not result in the conversion of the original state enterprise into the lease enterprise—the copyrights would not have passed to the lease enterprise by operation of law, at least not under Article 498.

There is no question that the High Arbitrazh Court rejects the conclusion that the lease agreement resulted in the transformation of the state enterprise. Among the findings of the April 3 and June 4 decisions that the High Arbitrazh Court "canceled" at the outset of the December 18 opinion, was the conclusion "about the state enterprise being converted into a lease enterprise." Dec. 18 Dec. at 2. As its sole support for this determination, the High Arbitrazh Court adopts a facially plausible, though analytically problematic, reading of the Fundamental Principles on Leasing. Article 16(1) of that statute sets forth procedures for the formation of a lease enterprise:

> The labor collective of a State enterprise ... shall have the right to form an organization of lessees as an independent juridical person in order to create a lease enterprise on the basis thereof.
>
> The decision to form an organization of lessees ... shall be taken by the general meeting (or conference) of the labour collective by not less than two thirds of the vote of its members.
>
> The organization of lessees shall jointly with the trade union committee work out a draft contract of lease and send it to the State agency empowered by the owner to lease State enterprises....

> After signature of the contract, *the organization of lessees* shall accept the property of the enterprise in the established procedure and *shall acquire the status of a lease enterprise.*

Fundamental Principles of Legislation of the USSR and Union Republics on the Lease, *in Basic Documents of the Soviet Legal System* 290–91 (W.E. Butler, ed.1991) [hereinafter "Fundamental Principles"] (emphasis added).

The High Arbitrazh Court interprets Article 16(1) as providing for the transformation of the "organization of lessees"—a group formed by the "labor collective," or employees, of the state enterprise solely for the purpose of signing the lease agreement—rather than the state enterprise itself. *See* Dec. 18 Dec. at 2. Having concluded that the Fundamental Principles on Leasing does not provide for the conversion of the state enterprise into the lease enterprise, the court must account for Article 16(4) of that statute which, as the court acknowledges, explicitly provides that upon execution of a lease agreement, "a lease enterprise becomes a successor of property rights and obligations of the state enterprise leased by it." *Id.* According to the High Arbitrazh Court, the legal succession provided for in Article 16(4) does not survive the term of the lease.

In support of this result, the court engages in a form of statutory construction, previously employed by FSUESMS's expert, Professor Maggs. The court cites Article 1 of the Fundamental Principles, the "General Provisions" of the statute, which establishes that a lease shall be for "fixed term possession and use." *Id.* Professor Maggs had previously suggested that under normal Soviet civil law drafting style, the General Provisions section of a statute should be considered applicable to the subsequent provisions except where it is "clearly negated." Maggs Decl. ¶ 38.

The High Court appears to adopt a similar approach here, concluding that "because a lease is a possession and use for a fixed period of a property complex" under the General Provisions of the statute, the succession of rights provided for in a subsequent section is properly understood to be "restricted by the term of the lease agreement." Dec. 18 Dec. at 2.

Proceeding from this interpretation of the Fundamental Principles on Leasing, the High Court goes on to observe that in the case of Soyuzmultfilm Studio, the "property complex" leased to the lease entity in 1989 was never privatized, and, thus, when the lease entity was converted into the joint stock company, SMS, the state retained its ownership interest in the leased property. *See id.* Upon the expiration of the lease in December 1999, the property reverted to its owner and was properly transferred by the state to FSUESMS. *See id.*

The High Court's conclusions concerning the disposition of the tangible leased property are not inconsistent with the plaintiffs' theory of the case, or with this court's August 27, 2001 order. Neither, for that matter, does the observation that the studio's tangible property remained in state ownership necessarily contradict the conclusions of the April 3 and June 4 opinions, which the High Arbitrazh Court purports to overturn. In the present proceeding, SMS does not claim any interest in the equipment and facilities leased by the state to its predecessor, the lease enterprise, and, in any event, the ownership of that property is not relevant to the instant dispute over the copyrights in Soyuzmultfilm Studio's Soviet-era films. The High Arbitrazh Court goes on to conclude, however, in somewhat broader language, that "[w]ith the expiration of the lease agreement, [SMS] had no further legal grounds for the use of rights and property obtained under this agreement." Dec. 18 Dec. at 3. On this basis, the court reinstates the January 25, 2001 ruling of the Moscow Region Arbitrazh Court that "[SMS] is not the successor of the state enterprise." *Id.*

Defendants argue that "it is absolutely beyond question that [the December 18, 2001 decision of the High Arbitrazh Court] finds *no legal succession* from the state enterprise to the lease enterprise." Defs.' Reply Mem. for Recons. at 2. Therefore, "the fundamental premise of plaintiffs' claim to [copyright] ownership, *i.e.* that the lease enterprise and joint stock company were legal successors to the state enterprise, has been utterly eviscerated by the December 18 Russian Decision." *Id.* Defendants acknowledge, as they must, that the High Arbitrazh Court does not expressly address the question of copyright ownership. However, they contend that the absence of any direct discussion of the copyrights is of no moment. Professor Maggs points out that the December 18, 2001 decision was rendered by way of supervisory review, the purpose of which is to correct errors of law in lower court proceedings, not to review findings of fact. Thus, the High Arbitrazh Court confines its discussion to the broader question of legal successorship, without addressing the disposition of any particular property, tangible or intangible. *See* Maggs 8th Supp. Decl. ¶ 10.

Professor Maggs construes the High Court's failure to discuss copyrights or other intangible rights that plaintiffs claim passed to the lease enterprise by operation of law as an implicit affirmation of defendants' position that the lease entity never received any property other than the tangible equipment and facilities expressly

transferred by the lease agreement.[32] *See* Maggs 7th Supp. Decl. ¶ 5. The High Arbitrazh Court never affirmatively asserts that the lease enterprise received nothing more than the tangible assets listed on the Soyuzmultfilm Studio balance sheets. However, the explicit conclusion that the state enterprise was not transformed would appear to frustrate any claim that the lease enterprise acquired the studio's copyrights by operation of law. Furthermore, the December 18, 2001 decision does expressly indicate that, at the end of the lease term, the successor of the lease enterprise, SMS, "had no further legal grounds for the use of *rights and property* obtained under [the lease] agreement." Dec. 18 Dec. at 3 (emphasis added). Defendants argue that this language is broad enough to negate the conclusion that any intangible rights that might have been transferred to the lease enterprise were retained after the lease expired in December 1999.

At the April 9 oral argument, FSUESMS's counsel supported this interpretation by explaining the December 18, 2001 decision as a ruling on SMS's standing to challenge the registration of FSUESMS:[33]

> The December 18th decision holds that the joint stock company had no standing to challenge that registration because it has no interest in any property claimed by [FSUESMS]. Specifically [FSUESMS] is claiming to be a bold successor to the State enterprise in every respect. In fact to be a continuation of the same enterprise.
>
> . . .
>
> I think if you look at the issue as being a standing issue, it is clear that we are talking not only about intangible rights but of tangible and intangible rights. Any rights that the State Enterprise had to which [FSUESMS] is now claiming title by virtue of its charter. As to any of those rights, the Joint Stock Company has no lawful right or interest. So I think it does pertain both to copyrights and to tangible rights.

Tr. of Apr. 9, 2002 Oral Arg. at 8–9.

Viewed as a ruling on SMS's standing to challenge FSUESMS's registration, the December 18, 2001 decision is more easily understood as addressing all the property

---

**32.** In this vein, Professor Maggs views the December 18 decision as a tacit vindication of his argument in favor of applying the September 28, 1999 Information Letter to the present case. "The reason that the December 18 Decision concentrates on [the rights transferred under the lease agreement]," Professor Maggs explains, "is that it was already perfectly clear from the previously published Information Letter of the High Arbitrazh Court of September 28, 1999 . . . that succession to assets of a film studio by a document transferring specific rights other than copyrights did not carry with it succession to the copyrights managed by a film studio." Maggs 8th Supp. Decl. ¶ 3. Of course, the High Court never references the Information Letter in its opinion, and this court has already expressed its continued doubts about the applicability of the case discussed therein to the Soyuzmultfilm Studio lease agreement of 1989. Furthermore, Professor Maggs' way of framing the argument assumes that the copyrights to the Soyuzmultfilm Studio films produced by the state enterprise, like the studio's tangible equipment and facilities, were state-owned and were merely under the "management" of the film studio. This court previously concluded, however, that Article 486 of the Soviet copyright law vested copyright ownership for a film in the studio that produced the film. Because the December 18, 2001 decision does not address the question of initial copyright ownership, that opinion does not on its face provide any reason to reconsider this court's previous conclusion on that issue.

**33.** Plaintiffs also frame the legal issue before the High Arbitrazh Court as concerning "the standing of the joint stock company to challenge the registration of [FSUESMS]." Stephan Supp. Decl., Mar. 21, 2002 ¶ 5.

and rights (tangible and intangible) to which SMS and FSUESMS might claim ownership. In effect, the April 3 and June 4 opinions, now overruled by the High Arbitrazh Court, also ruled on SMS's standing to bring a claim against FSUESMS. Those decisions, it might be remembered, held that independent of the tangible property that passed under the agreement with Goskino, the lease enterprise, and by extension SMS, were successors to other "rights and obligations" of the former state enterprise. Moreover, this successorship survived the termination of the lease. The April 3 and June 4 decisions ultimately held, however, that SMS could not assert a claim against FSUESMS—not because SMS had no rights, but rather because FSUESMS's charter, as those courts interpreted it, did not stipulate that it was a successor to the rights SMS validly claimed.

The December 18, 2001 decision of the High Arbitrazh Court reaches the same result—that SMS has no standing to challenge FSUESMS's registration—but overturns the reasoning of the April 3 and June 4 decisions. According to the High Court, SMS lacks standing to assert a claim against FSUESMS because SMS is not a legal successor to the original state enterprise. More importantly for the purposes of the present dispute, the court holds that SMS is not a successor because, to the extent that its predecessor, the lease enterprise, succeeded to the rights of the state enterprise, "this succession of rights [was] restricted by the term of the lease agreement." Dec. 18 Dec. at 2. According to defendants, just as the lease entity could not transfer to SMS the

"rights and obligations" to which it was arguably a temporary successor under the Fundamental Principles on Leasing, it similarly lacked the authority to grant a copyright license to FBJ.[34]

Plaintiffs' expert Professor Stephan contends that defendants read too much into the December 18, 2001 decision, which, he maintains, has no bearing on the disposition of Soyuzmultfilm Studio's copyrights. Professor Stephan reminds the court that Soviet law recognized three types of property that a lease enterprise could possess: 1) property acquired by lease; 2) property accumulated by the enterprise as the result of its economic activity; and 3) property acquired through legal succession. *See* Stephan Supp. Decl., Mar. 21, 2002 ¶ 7. He argues that in ruling that SMS is not a "successor" to the original state enterprise Soyuzmultfilm Studio, the December 18, 2001 opinion was concerned solely with the tangible property that passed under the lease agreement, i.e., property of type 1. This argument picks up on the High Court's conclusion that, upon expiration of the lease, SMS "had no further legal grounds for the use of rights and property obtained *under this agreement*," referring to the 1989 lease agreement. Dec. 18 Dec. at 3 (emphasis added); *see also id.* at 2 (overruling the conclusion that "the succession of rights of the lease enterprise *based on the lease agreement* is not restricted by the term of the agreement") (emphasis added). Plaintiffs have argued that the lease agreement itself did not, indeed could not, have transferred the copyrights to the lease enterprise because the lessor, Goskino, lacked the authority to transfer

---

**34.** It should be emphasized that defendants argue that the lease enterprise was *never* a successor to the copyrights for any of the films produced by the state enterprise, even during the lease term. *See* Maggs 7th Supp. Decl. ¶ 5 ("The decision of the High Arbitrazh Court did not need to discuss copyrights, because they never passed to the lessee organization at all."). Defendants believe that the lease agreement defines the totality of the property rights the lease enterprise acquired.

them. *See, e.g.,* Stephan Supp. Decl., Mar. 22, 2002 ¶ 8. Thus, according to Professor Stephan, the December 18 opinion, which, by its terms, reaches a conclusion about rights and property transferred "under [the lease] agreement," says nothing about non-leased property, including intellectual property, that the lease enterprise might have acquired through its own economic activity during the lease term or, more importantly, by operation of law under Article 498 of the Soviet copyright law. *See id.* ¶¶ 7–8.

As Professor Stephan would have it, the High Arbitrazh Court's ruling is, therefore, limited to the narrow proposition that "the ownership of balance sheet property rights transferred from [the state enterprise] to [the lease enterprise] pursuant to the lease [was] limited by the terms of the lease and that [the lease enterprise] did not receive any additional rights in this property as a result of legal succession." *Id.* ¶ 7. Thus, he concludes that "the December 18, 2001 decision ... does not state that with the termination of the lease either [the lease enterprise] or [SMS] ceased to own any rights, but only that the property obtained by [the lease enterprise] had to be surrendered to the Russian state, which in turn had the right to transfer that property to [FSUESMS]." *Id.* ¶ 9.

In reaching a conclusion concerning the succession of rights acquired *under the lease agreement*, the High Arbitrazh Court does appear to pass over the lower courts' distinction between property transferred for a limited term under the lease, and *other* rights that passed independently through legal succession. The deficiency in Professor Stephan's argument, however, is that it is ultimately unresponsive to the unequivocal conclusion of the December 18, 2001 High Court decision that, pursuant to the Fundamental Principles on

Leasing, the lease agreement did not effect the conversion of the state enterprise into the lease enterprise. Even if Professor Stephan were correct that the court only referred to tangible property when it concluded that "[w]ith the expiration of the lease agreement, the plaintiff had no further legal grounds for the use of rights and property obtained under this agreement," Dec. 18 Dec. at 3, the fact that the state enterprise was not converted into the lease entity would still undermine plaintiffs' central theory of the case: that the *transformation* of the state enterprise into the lease enterprise triggered the transfer of the copyrights to the lease entity by operation of law. In other words, even if the High Court argument Professor Stephan addresses were focused on what he terms "type 1 property," the conclusion that the state enterprise was not transformed (a conclusion Professor Stephan sidesteps) would nevertheless mean that no category 3 property, i.e., no copyrights, passed by operation of law under Article 498 of the 1964 Soviet Civil Code.

Moreover, Professor Stephan's interpretation of the December 18, 2001 decision ascribes too narrow a scope to the ruling. If, as Professor Stephan contends, the High Court simply wished to assert that the lease enterprise had no rights in the tangible leased property after the termination of the lease, there would have been no need to overrule the April 3 and June 4 decisions. Those cases acknowledged that the tangible property transferred by the lease agreement had to be returned upon the expiration of the lease term, and, moreover, that this property was properly transferred to FSUESMS. The significance of the April 3 and June 4 decisions lay in the conclusion that the maturation of the state's reversion interest in the tangible leased property did not mean that other rights and assets to which the lease

enterprise succeeded by operation of law, including presumably copyrights, would likewise revert. *See Films by Jove,* 154 F.Supp.2d at 476. "When the property is returned after the agreement ended," the April 3 decision explained, "there is no automatic return of the succession of rights and obligations." Apr. 3 Dec. at 5. Although copyrights are not specifically mentioned, it is clear that the "rights and obligations" to which the court refers here signifies intangible assets—or, at the very least, comprises property other than the tangible equipment and facilities that passed under the lease. To interpret "succession of rights and obligations" as referring only to the tangible property would be to attribute to the April 3 and June 4 courts the nonsensical argument that the return of the leased property upon expiration of the lease did not result in the automatic return of "rights and obligations" concerning the very same leased property.

Without explanation, Professor Stephan's reading of the High Arbitrazh Court's decision ascribes a new meaning to the succession of "property rights and obligations" provided for in Article 16(4) of the Fundamental Principles on Leasing—one that relates to tangible rather than intangible property. Plaintiffs have previously asserted that in making the lease entity the legal successor to the "property rights and obligations" of the state entity, Article 16(4) reflected the Soviet legislature's recognition that property other than the tangible property specified in the lease could pass to the lease enterprise through legal succession, in this case under Article 498 of the Soviet copyright law. *See* Stephan Decl., Jan. 22, 2001 ¶ 7; Newcity Decl. ¶¶ 59–60. Indeed, it would seem to be crucial to plaintiffs' theory of the case that this succession of "property rights and obligations" be treated as separate from the tangible property, which all the

parties agree, and all the relevant Russian decisions conclude, had to be, and was in fact, returned to the state upon the expiration of the lease agreement. Now, in order to dismiss the significance of the December 18 decision, Professor Stephan argues that the High Court's reasoning limiting the succession of rights provided for in Article 16(4) to the term of the lease was intended to suggest only that the rights of the lease enterprise in the facilities and equipment transferred by lease could not be extended beyond the lease term through legal succession. As discussed above, the April 3 and June 4 decisions never suggested that Article 16(4) permitted what would amount to a perpetual extension of the lease through legal succession. Instead these courts held that notwithstanding the termination of the lease, and the concomitant return of the leased property to the state, the other rights and obligations, presumably including copyrights along with perhaps other intangible forms of property, did not likewise revert.

In the final analysis, plaintiffs' efforts to dismiss the December 18, 2001 decision of the High Arbitrazh Court as irrelevant are unavailing. The opinion does not address the question of copyright ownership, but it does expressly, if somewhat unconvincingly, reject the premise upon which plaintiffs base their claim to the Soyuzmultfilm copyrights, *viz.* that the state enterprise was converted into the lease enterprise in 1989 and thereafter ceased to exist, triggering the transfer of the studio's copyrights to the lease enterprise by operation of law. Plaintiffs' narrower reading of the opinion as relating only to tangible property that passed under the lease fails to account for how the copyrights could have passed to the lease enterprise by operation of law, if, as the High Court explicitly held,

the lease agreement did not effect the transformation of the state enterprise into the lease enterprise.

However, the analysis of defendants' motion for reconsideration does not end here. It is apparent that the High Arbitrazh Court's December 18, 2001 ruling undermines certain operative premises supporting my previous decision. However, it still remains to be seen whether I am required to defer to that court's interpretation, or whether my decision may stand in spite of what appears to be contrary authority from the Russian courts.

### (5)

■ Under Rule 44.1 of the Federal Rules of Civil Procedure, the determination of a foreign country's law is an issue of law to be resolved by considering "any relevant material or source." To the extent it addresses issues relevant to the present dispute, the High Arbitrazh Court's December 18, 2001 decision clearly constitutes relevant (indeed, presumptively highly probative) evidence of the foreign law upon which this case turns. *See* Michael D. Ramsey, *Escaping "International Comity"*, 83 Iowa L.Rev. 893, 905 (1998) ("[F]oreign court rulings on the content of foreign law are ordinarily the best proof of that content.").

■ Defendants contend that this court should defer to the December 18 decision of the High Arbitrazh Court pursuant to principles of international comity. *See* Defs.' Mem. for Recons. at 13. "American courts will normally accord considerable deference to foreign adjudications as a matter of comity." *Diorinou v. Mezitis*, 237 F.3d 133, 142 (2d Cir.2001). In some cases, this deference leads a domestic court to adopt a foreign tribunal's previous resolution of a particular legal or factual issue, thus precluding parties to a foreign litigation from rearguing, in United States courts, matters previously resolved in the foreign forum. *See, e.g., Alfadda v. Fenn*, 966 F.Supp. 1317, 1330–32 (S.D.N.Y.1997) (precluding plaintiffs from relitigating issues previously resolved by a French court), *aff'd*, 159 F.3d 41 (2d Cir.1998); *Gordon & Breach Sci. Publishers*, 905 F.Supp. at 178–79 ("United States courts ... may *choose* to give res judicata effect to foreign judgments on the basis of comity."). Here, however, it is clear that the High Arbitrazh Court's findings can have no preclusive effect against FBJ, which was not a party to the Russian litigation. *See Gordon & Breach Sci. Publishers*, 905 F.Supp. at 179 n. 9 ("[W]hen parties currently before an American court were not parties to the foreign action, the Due Process Clause prohibits application of the rule of collateral estoppel against them.").

■ Thus, this court is faced with a conflict of laws problem, *viz.* how much weight to afford the High Arbitrazh Court's conclusions, in assessing the parties' rights, under Russian law, to the Soyuzmultfilm Studio copyrights.[35] This determination may likewise implicate comity concerns. However, deference to a foreign adjudication as a matter of comity is by no means automatic. *See Cunard S.S. Co.*,

---

35. It should be emphasized that the validity of FBJ's copyright license—the central issue in the present case—was not before the High Arbitrazh Court, and the court expressed no opinion on that question. However, as detailed above, the High Arbitrazh Court did conclude that the lease agreement did not effect a transformation of the state enterprise, and that the succession of rights contemplated by the Fundamental Principles on Leasing did not extend beyond the term of the lease. If credited, both conclusions bear on the lease enterprise's ownership interest in the Soyuzmultfilm Studio copyrights, and thus are relevant to determining the validity of the copyright license FBJ acquired from the lease entity in 1992.

*Ltd. v. Salen Reefer Servs. AB,* 773 F.2d 452, 457 (2d Cir.1985) (quoting *Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 440 (3d Cir.1971)("Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation.")). In particular, such deference is appropriate only if it "does not prejudice the rights of United States citizens or violate domestic public policy." *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713 (2d Cir.1987); *accord Cunard,* 773 F.2d at 457; *Bridgeway Corp. v. Citibank,* 45 F.Supp.2d 276, 285 (S.D.N.Y.1999), *aff'd,* 201 F.3d 134 (2d Cir.2000).

Therefore, although we begin with a presumption that the High Arbitrazh Court's December 18, 2001 decision constitutes probative evidence of the matters of Soviet law addressed therein, this court is not under any absolute obligation to follow the lead of the Russian courts in construing Soviet law. *Cf. Karaha Bodas Co., L.L.C. v. Perusahaan Pertamina Minyak Dan Gas Bumi Negara,* 313 F.3d 70, 92 (2d Cir.2002) ("[A] foreign sovereign's views regarding its own laws merit—*although they do not command*—some degree of deference.") (emphasis added). Deference to the High Court's legal conclusions, without analysis of their persuasiveness or consideration of other factors that might counsel against following that court's interpretation of Russian law, is not required.[36]

Plaintiffs point to several factors that weigh against deference to the High Arbitrazh Court's December 18, 2001 decision. First, Russia's civilian legal system does not follow the principle of *stare decisis,* and therefore, the precedential import of the December 18, 2001 decision as a gener-

ally applicable articulation of Soviet law is questionable. More importantly, plaintiffs have submitted a declaration from a Russian jurist casting doubt on the independence of the Russian judiciary in general, and, in particular, challenging the legal accuracy and ultimately the integrity of the High Arbitrazh Court's December 18, 2001 ruling.

### (a) The Weight of Judicial Precedent in a Civil Law System

Plaintiffs assert that even if the December 18, 2001 decision does address issues relevant to the resolution of the present dispute, this court can nonetheless "ignore all Russian decisions and rule on Russian law as set forth by experts." Pls.' Opp'n to Recons. at 9 n. 3. Plaintiffs note that the Russian courts function in a civil law system in which judicial decisions do not establish binding precedent and, in general, are not regarded as controlling sources of law. *See generally* John Henry Merryman, *The Civil Law Tradition* 22 (2d ed. 1985) ("[T]he familiar common law doctrine of *stare decisis*—i.e. the power and obligation of courts to base decisions on prior decisions—is ... rejected by the civil law tradition. Judicial decisions are not law."). Professor Stephan explains that, unlike their common law counterparts, the Russian courts

> lack the power to interpret law; they can only apply the law as they find it to particular facts. As they apply the law in a particular case, the courts might express inferences as to what the law of Russia might be, but these inferences are not considered to be especially meaningful. Expressions of the intention of the legislature and scholarly consensus have much greater weight as a

---

**36.** In this respect, this court's task differs from that of a federal court sitting in diversity, which must determine and apply state law

in conformity with the precedent of the courts of the relevant state.

source of understanding the law than do any opinions offered by courts in the context of particular disputes.

Stephan Decl., Jan. 22, 2001 ¶ 12. Accordingly, Professor Stephan argues, "materials emanating from the *Arbitrazh* system should be given only such weight as their persuasive force merits, and should not be regarded as authoritative pronouncements."[37] Stephan Reply Decl. ¶ 14.

Plaintiffs point to two authorities in support of the proposition that the relative unimportance of judicial decisions as a source of law in Russia's civil law system makes it appropriate for this court to ignore all the Russian court decisions that emerged from the litigation between SMS and FSUESMS and to make an independent assessment of Soviet law. First, plaintiffs cite a section of Professor Nimmer's treatise on copyright law. The relevant section discusses the ramifications of the Second Circuit's decision in *Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82 (2d Cir.1998). In that case, the Second Circuit established, as a matter of federal common law, a choice of law rule for determining copyright ownership. Noting that copyright is a form of property, the court borrowed the position of the Second Restatement on Conflict of Laws that the interest of parties in property is determined by the law of the state with "the most significant relationship" to

the property and the parties. *Id.* at 90 (citing Restatement (Second) of Conflict of Laws § 222).

Applying this doctrine to the case before it, which involved a dispute over Russian newspaper articles written by Russian nationals and first published in Russia, the court concluded that "Russian law is the appropriate source of law to determine issues of ownership of rights." *Id.* After summarizing the Second Circuit's legal ruling, Professor Nimmer notes that among the questions the courts will face in applying the holding is the issue presently before this court—namely, "how to go about determining foreign law":

Should it be to determine the law as propounded by the experts? Should it be, as in diversity cases, an attempt to divine what the highest court of the affected jurisdiction would determine it to be? Indeed, if Russian courts subsequently weigh in on the question at issue before the Second Circuit, should a district court in New York follow *Itar–Tass* as a matter of *stare decisis* or defer to what those home courts have determined in the interim? If so, is it only a decision of the highest court that deserves to be followed? Or should even that court's pronouncements not be followed, to the extent that they come from

---

**37.** Professor Stephan further contends that the authority of the Russian arbitrazh court's pronouncements is especially diminished in the particular circumstances of the present case, insofar as the arbitrazh courts are a part of the legal system of the present Russian Federation and thus are not "creatures of or representatives of Soviet, as opposed to Russian law." Stephan Decl., Jan. 22, 2001 ¶ 12. The Fundamental Principles on Leasing, the legislation that plaintiffs argue provided for the transformation of state enterprise into lease enterprises, was a Perestroika-era enactment of the Soviet government. *See id.* Professor Stephan contends

that no interpretation of *Soviet* law during the 1989–1990 period by a contemporary *Russian* court would be considered an authoritative interpretation by Russian legal thinkers. *See id.* These observations might be understood to blunt any comity concerns, since, in effect, the sovereign that enacted the laws this court is now called upon to interpret, the Soviet Union, is not the same sovereign whose courts have subsequently weighed in on the matter. In the end, however, Professor Stephan concedes that the Russian courts are "certainly in a position to offer an informed opinion on matters of Soviet law." *Id.*

a civil law system, which lacks a system of *stare decisis?*

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* [hereinafter "Nimmer"] § 17.05[B][4]. After laying out the issues, Professor Nimmer concludes that "all of these matters remain unaddressed in the [*Itar–Tass*] ruling, and hence [are] unanswered at present." *Id.* Thus, despite plaintiffs' repeated citations to Professor Nimmer's treatise, *see, e.g.*, Pls.' Supp. Reply Mem. of Law at 3; Tr. of June 5, 2001 Oral Arg. at 52; Pls.' Opp'n to Recons. at 9 n. 3, the treatise at best opines that when future courts face the task of applying the holding in *Itar–Tass*, the relative weight to be assigned to Russian judicial interpretations of Russian law is an open question that will require the creation of additional federal common law to fill the interstices of the Copyright Act. *See* Nimmer § 17.05[B][4].

Plaintiffs locate a somewhat more decisive authority in the Second Circuit's decision in *Itar–Tass*. Although, as Professor Nimmer rightly points out, the Second Circuit did not provide any explicit guidance on the question of how to determine the content of foreign law, Professor Stephan contends that the Second Circuit's analysis in *Itar–Tass* implicitly affirms his position concerning the limited significance of arbitrazh court decisions as evidence of Soviet law. Specifically, he notes that in determining the parties' rights under Russian law, the Second Circuit summarily disregarded the decision of a Russian arbitrazh court that "seemed to offer an unpersuasive interpretation of Russian copyright law." Stephan Reply Decl. ¶ 14

(citing *Itar–Tass*, 153 F.3d at 93 n. 14). Similarly, Professor Stephan argues, this court is free to disregard unpersuasive legal conclusions from the arbitrazh court decisions in the litigation between SMS and FSUESMS. *See id.*

Professor Stephan is correct that in *Itar–Tass*, the Second Circuit unhesitatingly rejected the legal conclusion of a lower arbitrazh court. Having relegated its discussion of that case to a footnote, the court evidently did not regard the decision as particularly significant, even though the arbitrazh court addressed the precise issue of Russian law that was before the Second Circuit.[38] However, the arbitrazh court decision that the Second Circuit dismissed in *Itar–Tass* can be distinguished from the December 18, 2001 decision upon which defendants rely in at least two respects: 1) the ruling was rendered by one of the lower courts in the arbitrazh system; and 2) it does not appear to have involved any of the parties to the *Itar–Tass* case.

On the face of it, one would expect that a decision from the High Arbitrazh Court would be afforded greater weight as evidence of the content of Soviet law than the decision of a lower court, in light of the High Court's status as the court of last resort for commercial disputes in the Russian Federation. Moreover, unlike the other courts in the arbitrazh system, the High Arbitrazh Court evidently does have some limited authority to interpret Russian law. Article 10(1) of the Federal Constitutional Law on Arbitrazh Courts authorizes the High Arbitrazh Court to "study and generalize . . . the application by arbi-

---

**38.** In fairness, it appears that the arbitrazh court opinion rejected by the Second Circuit was not simply unpersuasive but patently contrary to an express provision of Russian statutory law. The arbitrazh court concluded that, based on Article 14(2) of the Russian Copyright Law, a newspaper owns exclusive rights

in the articles it publishes. However, according to the Second Circuit, Article 14(4) of the same statute, a provision the arbitrazh court apparently ignored, expressly renders Article 14(2) inapplicable to newspapers. *See Itar–Tass*, 153 F.3d at 93 n. 14.

trazh courts of the laws and other normative legal acts [and] regulations ... [in] the sphere of entrepreneurial and other economic activity." Stephan Decl., Jan. 22, 2001 ¶ 13. To this end, plenary sessions of the High Arbitrazh Court issue advisory opinions, known as Information Letters, which are addressed to the lower courts as guiding explanations of the law.[39]

Professor Stephan points out that the December 18 decision was rendered by the Presidium of the High Arbitrazh Court, which is a lower committee of the court. *See* Stephan Supp. Decl., Mar. 21, 2002 ¶ 3. According to Professor Stephan, although the High Arbitrazh Court is the court of last resort for commercial disputes in the Russian Federation, and thus its rulings in individual cases cannot be appealed by the parties, statements the Presidium makes in decisions resolving particular cases nevertheless have no precedential weight. Such statements are not intended "to send a broader message to other courts, but only to guide the lower courts dealing with the particular dispute." *Id.* This is evidenced, according to Professor Stephan, by the fact that arbitrazh court opinions do not cite or otherwise refer to other court decisions, even those rendered by the High Arbitrazh Court itself, with the exception of earlier decisions from the same proceeding. *See id.*

Professor Maggs counters that High Arbitrazh Court opinions are published on the court's internet site, and that lower courts are in fact expected to study these decisions, risking reversal should they fail to follow the legal principles enunciated in them. *See* Maggs 7th Supp. Decl. ¶ 4. Professor Stephan claims that in many parts of Russia, lower courts lack practicable access to the internet, and, therefore, cannot study the High Court's internet site. *See* Stephan Supp. Decl., Mar. 21, 2002 ¶ 4. Professor Maggs responds that internet access, at least in the Moscow courts, is more widespread than Professor Stephan believes. *See* Maggs 8th Supp. Decl. ¶ 7. In addition, according to Professor Maggs, lawyers arguing cases before the arbitrazh courts routinely cite relevant High Arbitrazh Court rulings. *See id.*

This court is in no position to resolve these factual disputes concerning arbitrazh practice. It might be noted, however, that even if Professor Maggs is correct, his arguments at best suggest that the High Arbitrazh Court's December 18, 2001 decision might be "brought to the attention" of a Russian court hearing a case involving similar issues. *Id.* Professor Maggs has not established, or even directly asserted, that the decision would be in any sense formally binding as *stare decisis.* And this is precisely plaintiffs' point: that Russian judicial decisions resolving individual cases, even those rendered by the High Arbitrazh Court, lack the precedential authority of analogous decisions in common law regimes, and therefore, the High Arbitrazh Court's December 18, 2001 decision is entitled to less weight than defendants' arguments suggest. *See* Defs.' Mem. for Recons. at 11 (arguing that the High Arbitrazh Court decision constitutes "dispositive" Russian legal authority).

---

**39.** Professors Maggs and Stephan debate the extent to which such High Court guidance can be considered a conclusive articulation of the law. Professor Maggs asserts that the lower arbitrazh courts are expected to study and follow the Information Letters or risk reversal. *See* Maggs Reply Decl. ¶ 5. Professor Stephan seems to believe that the legal interpretations the High Court sets forth in its Information Letters are of more modest precedential significance, providing "guidance as to what [the High Arbitrazh Court] believes the law to be." Stephan Reply Decl. ¶ 14. On the other hand, Professor Stephan does not dispute that lower courts are expected to follow that guidance.

In the end, however, the undeniably diminished significance of judicial opinions in the civil law system of the Russian Federation is not, in itself, a sufficient ground for disregarding the legal conclusions articulated in the December 18, 2001 decision of the High Arbitrazh Court. Even if the High Court's decision is not a conclusive statement of the matters of Soviet law upon which this case turns, it nevertheless undoubtedly constitutes relevant evidence under Rule 44.1. *See, e.g., Carlisle Ventures, Inc. v. Banco Espanol de Credito, S.A.*, 176 F.3d 601, 608 (2d Cir.1999) (citing a case from the Supreme Court of Spain, a civil law jurisdiction, as relevant proof of Spanish law).[40] In the absence of countervailing evidence or other circumstances weighing against deference to the High Arbitrazh Court's conclusions, there would be no reason for this court to deviate from the December 18, 2001 decision with respect to the effect of the lease agreement and the succession of rights from the state enterprise to the lease enterprise and SMS.

Indeed, at first blush, the case for adhering to the High Arbitrazh Court's conclusions would appear to be particularly strong here, insofar as the decision addresses the very leasing transaction that FBJ claims transferred the Soyuzmultfilm Studio copyrights to the lease enterprise, FBJ's licensor. Although the High Court does not specifically consider, much less determine, the disposition of Soyuzmultfilm Studio's copyrights, the December 18, 2001 decision does reach conclusions that would appear irreconcilable with plaintiffs'

argument—and this court's determination—that the lease enterprise succeeded to ownership of Soyuzmultfilm Studio's copyrights by operation of law, under Article 498, upon the reorganization of the state enterprise Soyuzmultfilm Studio into the lease enterprise bearing the same name. Most fundamentally, the High Arbitrazh Court suggests that no such reorganization took place.

In the ordinary case, this court would be inclined to adopt the High Arbitrazh Court's positions with respect to issues of Soviet law. However, this is no ordinary case. First, there are strong reasons to question the accuracy of the December 18, 2001 decision on its face. Furthermore, plaintiffs have presented specific evidence indicating that the decision was, in fact, animated by coordinated efforts on the part of the Russian government to renationalize studio copyrights, recapturing for the state property rights that were acquired nearly a decade earlier by an American investor.

### (b) The Persuasiveness of the High Arbitrazh Court's Decision

This court has already expressed skepticism about various aspects of the High Arbitrazh Court's December 18, 2001 decision. The conclusion that the state enterprise Soyuzmultfilm Studio was not transformed into the lease enterprise would seem to run counter to the apparent purpose of the Fundamental Principles on Leasing, which was to effect the incremental privatization of the Soviet economy. *See* Stephan Decl. ¶ 7 ("The lease enterprise was intended to serve as a bridge to

---

**40.** In fact, while explicitly cautioning that Russian judicial opinions are not entitled to the same weight as similar decisions in common law jurisdictions, plaintiffs' expert Professor Newcity cited two arbitrazh court decisions to support the argument that Soviet law vested the ownership of motion picture copyrights in the studio that produced the film.

*See* Newcity Decl. ¶ 40. This court considered these cases, as well as the December 26, 2000 decision of the Moscow Region Arbitrazh Court in the FSUESMS–SMS litigation, as relevant, though not conclusive, support of that proposition. *See Films by Jove*, 154 F.Supp.2d at 452.

privatization and the creation of a fully private corporation."). At the very least, the High Court's suggestion that the "activity of the state enterprise" was not terminated by virtue of the lease agreement,[41] is plainly contrary to the facts and the reality on the ground. Neither defendants nor the High Arbitrazh Court have offered any evidence to contradict this court's previous observation that "the state enterprise did not undertake a single act, either official or unofficial, to which anyone can point between 1989 and 1999." *Films by Jove*, 154 F.Supp.2d at 480. Defendants characterize FSUESMS's registration in 1999 as an "amendment" to the 1936 charter of the state enterprise Soyuzmultfilm Studio—an amendment that was supposedly necessitated by the adoption of the Civil Code of the Russian Federation, First Part, in 1994. *See* Maggs Decl. ¶ 11; Defs.' Reply Mem. for Recons. at 5. The suggestion is that FSUESMS and the state enterprise Soyuzmultfilm Studio are one and the same, the latter having re-emerged from hibernation as a continuation of the former. However, defendants do not explain why the 1999 "amendment" to the charter of the state enterprise—if it truly were an amendment—did not occur until five years after the enactment of the law that supposedly created the necessity for the change. *See Films by Jove*, 154 F.Supp.2d at 467. Neither do they adequately reconcile the alleged existence of the state enterprise during (and after) the lease term with an admitted decade of complete inactivity.

This court's misgivings are reinforced and amplified in a declaration submitted on behalf of plaintiffs by Dr. Sergei Anatolievich Pashin, a Russian lawyer, law professor, and former judge, with impressive expert credentials. Most notably, Dr. Pashin participated in drafting the currently effective Federal Constitutional Law "On Arbitrazh Courts in the Russian Federation," and the Arbitrazh Procedure Code, as well as other laws concerning Russian judicial practice. *See* Pashin Decl. ¶¶ 1–25. In a declaration presented in conjunction with Dr. Pashin's affidavit, Edmund Beard, a professor of political science at the University of Massachusetts Boston, who has worked with Dr. Pashin, describes him as "a man of enormous stature, accomplishment and credibility," and as "perhaps *the* most distinguished figure in the area of judicial reform in Russia today." Decl. of Professor Edmund Beard at 1.

Dr. Pashin dismisses as "unprecedented" and "illogical" the High Arbitrazh Court's conclusion that the Soyuzmultfilm Studio lease agreement did not transform the state enterprise into the lease enterprise. Pashin Decl. ¶ 30. According to Dr. Pashin, an analysis of the Fundamental Principles on Leasing, passed in November 1989, "leaves no room for doubt that: First, the State enterprise [Soyuzmultfilm Studio] was transformed into the lease enterprise ... according to the wishes of the general conference on signing a lease contract .... [and][s]econdly, at that moment the State enterprise lost its quality as a juridical person and ceased to exist." *Id.* ¶¶ 32–33.

The High Arbitrazh Court's analysis would mean that the state enterprise somehow continued to exist throughout the lease term, despite having no office, no personnel, no assets, and conducting no business operations or any other activities during this period. Such a result is nonsensical according to Dr. Pashin and does

**41.** *See* Dec. 18 Dec. at 2 (rejecting the lower court's "conclusion that the activity of the state enterprise ... ceased through the conversion into a lease enterprise" as a "wrong interpretation of law").

not accord with Soviet or Russian law. As a practical matter, following the execution of the lease agreement, the state enterprise was no longer functioning as "an independent commercial entity producing a product or providing services or labor," and therefore, it did not "fall within the definition of an enterprise contained in Part 1, Article 4 of the Law [on Enterprises and Entrepreneurship] of the RSFSR of December 25, 1990." *Id.* ¶ 35. Similarly, after the lease agreement entered into effect, the state enterprise "lost all the qualities of the juridical person established by Article 23 of the Civil Code of the Russian Federation of 1964," including ownership of defined property and the ability to acquire rights and fulfill obligations. *Id. See also* Stephan Supp. Decl., June 20, 2001 ¶ 14 (explaining that "Soviet legislation ... had elaborate formalities and requirements, involving registration, maintenance of a bank account, and tax filings, with which an enterprise had to comply to continue in existence"); Pls.' Supp. Reply Mem. of Law at 4 (asserting that none of the "formalities and requirements" to which Professor Stephan refers were undertaken on behalf of the state enterprise Soyuzmultfilm Studio during the lease term).

The High Arbitrazh Court's contrary explanation that the 1989 lease agreement transformed the "organization of lessees" into a lease enterprise—the apparent implication of which is that the state enterprise somehow survived as an independent legal entity—is for Dr. Pashin a specious argument that could only have been motivated by the court's desire to manufacture an outcome perceived to be favorable to the financial interests of the Russian state. Dr. Pashin accuses the High Arbitrazh Court of deliberately distorting the law in an effort

> to make it appear as if the state enterprise did not transform into the lease enterprise. The statement that an organization of lessees created by a labor collective, not a state enterprise, is converted into a lease enterprise might be interpreted to mean that the involvement of an organization of lessees somehow affects the undeniable fact that the state enterprise transformed into the lease enterprise.
>
> An organization of lessees is merely the workers of the lease enterprise. Said parties execute documents authorizing the transformation. It is merely a ministerial middle step in the transformation from the state enterprise to lease enterprise. It does not affect the fact that the state enterprise transformed into the lease enterprise and the state enterprise ceased to exist thereafter. *Tens of thousands of state enterprises have been transformed in the same manner.*
>
> The High Arbitrazh Court used an unprecedented and illogical judicial construction because the lease enterprise could not have inherited any assets from the organization of lessees because it was created by the collective for the sole purpose of signing the agreement with Goskino. All rights that the lease enterprise inherited would have been inherited from the state enterprise.

Pashin Decl. ¶¶ 28–30 (emphasis added).

Dr. Pashin further argues that "the position of the High Arbitrazh Court in its December 18, 2001 decision appears to be inconsistent with the position that the courts of general jurisdiction as well as the High Arbitrazh Court itself have previously taken about related questions." *Id.* ¶ 36. In this connection, Dr. Pashin first cites a series of decisions from the courts of general jurisdiction, involving complaints of employees of a state-owned enterprise who were fired at the time a lease

agreement was executed by the labor collective of the state enterprise. In those cases, the courts, according to Dr. Pashin, recognized that the lease agreement had the effect of transforming the state enterprise into a lease enterprise. As a result, the former employees of the state enterprise had a right to continue labor relations with the lease enterprise, which was the successor to their previous employer. *See id.*

Even more on point, and thus more perplexing, is a decision of the High Arbitrazh Court of January 23, 2001, which, according to Dr. Pashin, stated unequivocally that the state enterprise for design, remodeling and construction, known as Mosoblremstroy, was transformed into a lease enterprise, called PPRS Mosoblremstroy. *See id.* ¶ 37; Jan. 23, 2001 Dec., attached to Jan. 9, 2003 Letter of Kenneth Feinswog [hereinafter "Jan. 23 Dec."]. In that case, Dr. Pashin explains, "the law was implemented according to its actual meaning. The court stated that the state enterprise, not the organization of lessees, was transformed into a lease enterprise." Pashin Decl. ¶ 37. Finding no legal explanation for the directly contrary position the High Arbitrazh Court took in interpreting the effect of the Soyuzmultfilm Studio lease agreement, Dr. Pashin concludes that "there was a distortion in this case of the legal framework in favor of the interests of the organs of executive power. In Russia this phenomen[on] is called 'an ordered judicial decision.' " *Id.* ¶ 38. Thus, Dr. Pashin questions not simply the legal accuracy, but, ultimately, the legality of the December 18, 2001 decision. The High Court's suggestion that the lease agreement did not effect a reorganization of the state enterprise, supported solely by "illogical and entangled judicial constructions," resulted, according to Dr. Pashin, "in a decision which allowed the organs of the executive branch to interpret this deci-sion in any manner they deemed fit[,] which would be for the purpose of protecting what is specifically understood to be 'state interest.' " *Id.* ¶ 39.

Professor Maggs responds that Dr. Pashin completely misrepresents the High Arbitrazh Court's argument concerning the alleged transformation of the state enterprise Soyuzmultfilm Studio under the 1989 lease agreement. Contrary to Dr. Pashin's allegation that the court issued an outcome-driven opinion, which employed an illogical judicial construct, Professor Maggs argues that the court's conclusion was compelled by Article 16(1) of the Fundamental Principles on Leasing. *See* Maggs 9th Supp. Decl. ¶¶ 55–56. This provision, Professor Maggs points out, was directly relied on by the High Arbitrazh Court but is not discussed in Dr. Pashin's assessment of the December 18, 2001 decision. *See id.* ¶ 55. In particular, Article 16(1) indicates that "[a]fter the signature of the [lease agreement], *the organization of lessees* shall accept the property of the enterprise . . . and shall *acquire the status of a leased enterprise.*" Fundamental Principles at 291 (emphasis added). Thus, Professor Maggs contends, the plain language of the statute, and not any ulterior motive, dictated the High Court's conclusion that the "organization of lessees," rather than the state enterprise, is transformed into the lease enterprise. It follows, according to Professor Maggs, that upon its transformation into the lease enterprise, the organization of lessees, having been formed solely to sign the lease agreement with Goskino, could only bring with it the tangible property that it acquired under that lease, not any other property that might have belonged to the state enterprise. *See* Maggs 9th Supp. Decl. ¶ 6.

As for the prior judicial opinions that Dr. Pashin claims contradict the December

18, 2001 decision of the High Arbitrazh Court, Professor Maggs contends that they are distinguishable. The first set of cases concerned labor law, the principles of which, Professor Maggs claims, are "quite different" under Russian law than the principles of civil law. *Id.* ¶ 57. In particular, Russian labor law is designed to protect the job rights of workers. Thus, "if the result of a lease of all or even part of an enterprise is to transfer a job position from a state enterprise to a lessee enterprise, it may be quite appropriate under labor law to give an employee of a state enterprise the right to continue its employment with a lessee enterprise. Otherwise, by use of leasing, an enterprise could rid itself of obligations under labor law to provide employees with job security." *Id.*

To distinguish the January 23, 2001 decision of the High Arbitrazh Court—the decision in which the High Arbitrazh Court explicitly stated that a state enterprise was transformed into a lease enterprise—Professor Maggs points out that in that case, in contrast to the Soyuzmultfilm Studio lease agreement, the lessee enterprise eventually purchased the leased property. It is not immediately apparent why this distinction should produce two apparently contradictory outcomes. Nothing in the January 23, 2001 decision suggests that the transformation of the state enterprise Mosoblremstroy depended on the purchase of the leased property. In fact, the High Arbitrazh Court indicates that the transformation was effected on February 3, 1990, while the agreement to purchase the

leased property was not executed until the following year on December 29, 1991. *See* Jan. 23 Dec. at 1, 3.

In suggesting that the lease entity's eventual purchase of leased property is a determinative factor, Professor Maggs may be alluding to previous submissions in which he argued that Article 10 of Fundamental Principles on Leasing provided for two distinct types of leasing arrangements: those where the contract of lease did and those where it did not provide for an eventual buy-out of the leased property. *See* Maggs Decl. ¶ 61; Maggs Reply Decl. ¶ 32. The thrust of this argument appears to be that, notwithstanding the execution of a lease agreement, a state enterprise is not actually privatized (i.e., it is not "transformed" into the lease enterprise) until this buyout right, if it exists at all, is exercised.[42] The Soyuzmultfilm lease agreement of December 1989 expressly provided that the leased property would remain in state ownership. The state never consented to a transfer of title to this property, and, in fact, demanded return of the property upon expiration of the lease agreement in December 1999. Therefore, the argument would go, there was no transformation under the Soyuzmultfilm Studio lease agreement, even though other leasing arrangements, such as the one discussed in the January 23, 2001 High Arbitrazh Court decision, that did allow the lease enterprise to purchase the leased property, could ultimately result in the transformation of the state enterprise into the lease enterprise.

---

**42.** Professor Maggs' understanding does find some apparent support in the January 25, 2001 decision of the Moscow Region Arbitrazh Court, which the High Arbitrazh Court reinstated. In rejecting SMS's claim to be the successor to the original state enterprise *Soyuzmultfilm Studio,* the court explained: Transformation provides, above all, for ownership of the assets of the reorganized enterprise to be transferred to the newly established enterprise. That never took place because, following the establishment of the lease-holding enterprise, the physical assets of the state-owned enterprise ... remained state property and remain such to this day. Jan. 25 Dec. at 3.

Whatever the argument's merit, Professor Maggs does not expressly reiterate his previous position regarding Article 10 of the Fundamental Principles in his response to Dr. Pashin. Instead, after noting that, in the Mosoblremstroy case, the lease enterprise eventually purchased the leased property, Professor Maggs posits that "if Plaintiffs' claim were correct that [the] transformation of a state enterprise into a leased enterprise gave the lessee permanent title to property obtained in connection with the lease, then it would have been unnecessary for the lessee enterprise to have bought the property." Maggs 9th Supp. Decl. ¶ 58.

Professor Maggs mischaracterizes plaintiffs' arguments about the effect of the lease agreement, betraying, in the process, fundamental flaws in defendants' theory of the case. Plaintiffs have never maintained that the transformation of the state enterprise into the lease enterprise resulted in the permanent transfer of all property obtained "in connection with the lease." In fact, plaintiffs do not argue that the lease enterprise retained an interest in any of the property leased from the Russian state, following the termination of the lease agreement. Plaintiffs do claim ownership in the copyrights for the Soviet-era films produced by Soyuzmultfilm Studio. However, the record clearly establishes that these copyrights were never state

property, but rather were owned by the studio itself. This conclusion is supported, if not compelled, by the plain language of Article 486 of the 1964 Soviet Civil Code, and the analogous provision of the 1928 code, both of which vest copyright ownership in a film in the enterprise that produced the film. Moreover, the Russian scholarly authority presented to this court unanimously confirms the proposition that "the state enterprise responsible for producing a film owns the copyright to that film." [43] *Films by Jove*, 154 F.Supp.2d at 451–52.

During nearly all of the Soviet period, Soyuzmultfilm Studio's copyright ownership rights, though legally recognized, were of little or no practical commercial value to the studio, as a result of the Soviet state's monopoly over domestic and foreign film distribution. *See* Paul B. Stephan, *Toward a Positive Theory of Privatization—Lessons from Soviet–Type Economies*, 16 Int'l Rev. L. & Econ. 173, 187 (1996) ("Under Soviet-type systems intellectual property rights had no value, because the state monopolized production."). However, during Perestroika, these commercial rights were reintegrated into the underlying copyright "clearing up any ambiguity that may have existed about the division of what American jurists would think of as copyright ownership." *Films*

**43.** Supplementing the litany of expert commentary on the issue of copyright ownership presented in conjunction with plaintiffs' cross-motion for summary judgment, plaintiffs have submitted an article by Professor V.A. Dozortsev, which appeared in the Journal of the High Arbitrazh Court in 2000. Professor Dozortsev confirms that Article 486 of the Soviet Civil Code vested ownership of motion picture copyrights in the studio that produced the film, rather than the state, even though, at the time this provision was enacted—and for many years thereafter—all Russian film studios were state-owned. *See* V.A. Dozortsev, *Right to the Film as a Complex Multi–Layered Work*, Journal of the High Arbitrazh Court of the Russian Federation, No. 3 (2000), Ex. 1, attached to Supp. Decl. of Michael Newcity, Apr. 8, 2002 [hereinafter "Supp. Newcity Decl."]. The publication of Professor Dozortsev's article in the High Arbitrazh Court's Journal, while not necessarily indicating the High Court's endorsement of his argument, is nonetheless an indication of his stature as a legal scholar. *See* Supp. Newcity Decl. ¶ 5. Indeed, Professor Maggs himself acknowledges that Professor Dozortsev is a "distinguished expert." Maggs Reply Decl. ¶ 18.

*by Jove,* 154 F.Supp.2d at 480. Crucially, nothing in the High Arbitrazh Court's decision suggests otherwise. The December 18, 2001 decision simply does not address the question of copyright ownership, and thus provides no reason to question the well-supported premise that motion picture copyrights were studio property.[44]

Because the Soviet state did not own Soyuzmultfilm Studio's copyrights in the first instance, those rights could not properly have been the subject of the 1989 lease agreement, and the fact that the agreement did not transfer title to any property leased from the state does not mean that copyright ownership did not pass to the lease enterprise. As Professor Stephan explained:

> Article 4 of the Fundamentals states that the right to lease property belongs to the owner of that property. The lease between Goskino and [the lease enterprise Soyuzmultfilm Studio] therefore covered only property under the management of Goskino, and had no bearing on those interests belonging to [the state enterprise Soyuzmultfilm Studio] in its own right. The land occupied by the studio and other material assets (such as film stock) was under the operative management of the higher bureaucratic agency Goskino. [The lease enterprise Soyuzmultfilm Studio] obtained only such an interest in those assets as Goskino conveyed by lease. But as to other rights—the copyrights, contracts with skilled employees of the studio, the know-how on which a creative enterprise rests, past awards and the reputation that went with them, indeed almost everything that would make a film studio valuable—[the lease enterprise Soyuzmultfilm Studio] obtained ownership by stepping into the shoes of its predecessor pursuant to Article 498 of the Civil Code, not by lease based on the Fundamentals.

Stephan Decl., Jan. 22, 2001 ¶ 8.

Defendants, of course, argue that the contention that the lease enterprise "stepped into the shoes" of the state enterprise begs the question insofar as plaintiffs assume that the lease agreement effected the transformation of the state enterprise Soyuzmultfilm Studio into the lease enterprise, laying the necessary predicate for a transfer of the studio's copyrights by operation of law under Article 498. Because the High Arbitrazh Court concluded that the lease enterprise did not transform the state enterprise, defendants contend, the lease enterprise was not a successor under Article 498, and therefore would not have acquired the Soyuzmultfilm Studio copyrights even if the state enterprise studio had been the initial copyright owner under Soviet law.

---

**44.** Professor Maggs resorts to arguments already rejected in this court's August 27, 2001 decision in an effort to refute this premise. In particular, Professor Maggs devotes a significant portion of his Ninth Supplemental Declaration to reasserting his contention that the Russian verb "prinadlezhat," which appears in Article 486 of the Soviet Civil Code, is properly translated as "belongs to" rather than "owns." *See Maggs 9th Supp. Decl.* ¶¶ 14–19. The supposed implication of this translation is that the studio's rights under Article 486 are limited to "operative management" of the copyrights, which were in fact owned by the state. In the absence of any new evidence supporting this argument, however, its mere reiteration cannot support a motion for reconsideration. *See PAB Aviation, Inc.,* 2000 WL 1240196, at *1 (noting that a party moving for reconsideration may not "merely reiterate or repackage an argument previously rejected by the court"); *Resource N.E. of Long Island, Inc.,* 80 F.Supp.2d at 64 ("[A motion for reconsideration] is not a vehicle to reargue those issues already considered when a party does not like the way the original motion was resolved.").

The logic of the High Arbitrazh Court's conclusion that the state enterprise Soyuzmultfilm Studio was not transformed into the lease enterprise would reduce the 1989 agreement to an ordinary leasing transacting that did nothing more than effect a temporary transfer of certain state property. It is clear, however, that the statute—the Fundamental Principles on Leasing—was intended to accomplish more than "the transfer of state property to lease enterprises ... for a limited term." Stephan Decl., Jan. 22, 2001 ¶ 6. Indeed, the principle purpose of the legislation was to encourage and facilitate the eventual conversion of state enterprises into privately-owned companies. To this end, "the Fundamentals permitted a complete transformation of a state enterprise into a lease enterprise, resulting in the disappearance of the state enterprise and the emergence of the lease enterprise as its legal successor." *Id.* ¶ 7. As Professor Stephan notes, the political and legal authorities who first introduced and defended the leasing legislation attested to its broader purpose:

> In a 1988 speech to the Central Committee of the Communist Party of the Soviet Union, General Secretary Gorbachev spoke of the need to extend leasing relations to "all branches of the national economy," explaining that these relations "ensure the real economic independence and responsibility of workers and labor collectives, as well as a direct connection between people's earnings and the final result of their work." ... There ensued what U.S.S.R. Prime Minister Ryzhkov described as "a massive *conversion* to leasing."

*Id.* ¶ 6 (emphasis added).

In the case of Soyuzmultfilm Studio, Goskino's order calling for the creation of the lease enterprise indicated that the studio was to be *"transfer[ed]* ... to lease." Ex. E, attached to Decl. of Sergey

Skuliabin (emphasis added). Similarly, many of the lower arbitrazh court opinions in the record expressly conclude that the execution of the lease agreement in 1989 effected a transformation of the state enterprise into the lease enterprise. *See* Dec. 26 Dec. at 7 ("When leasing out an enterprise (state property) took place ... this action shall constitute an actual reorganization of a state enterprise."); Feb. 22 Dec. at 6 ("[A]t the time the enterprise switched to lease relations, a factual reorganization of the enterprise occurred."); Apr. 3 Dec. at 4–5 ("[Upon] signing the lease agreement ... the activity of the state enterprise ceases through the conversion resulting from the formation of a lease enterprise on the basis of a state enterprise."). Indeed, as Dr. Pashin points out, the High Arbitrazh Court has itself indicated, in the Mosoblremstroy case, that a lease agreement effected the conversion of a state enterprise into the lease enterprise. *See* Jan. 23 Dec. at 3 ("According to the decision of the Executive Committee of the Moscow Region of the Soviet of People's Deputies ... *State Enterprise [Mosoblremstroy] was transformed into the lease enterprise [Mosoblremstroy].*") (emphasis added).

Defendants make much of the absence of any official document or decree conclusively indicating that the state enterprise Soyuzmultfilm was transformed into the lease enterprise and ceased to exist thereafter. *See* Defs.' Mem. for Recons. at 6 n. 4 ("Plaintiffs simply argue that the Lease Enterprise magically "stepped into the shoes" of the state entity without so much as a note to the file."). However, Professor Stephan credibly explains that this apparent lack of formality was simply a function of the chaotic political climate in which the leasing legislation was enacted:

> [T]he 1989 transformation of [the state enterprise Soyuzmultfilm Studio] into

[the lease enterprise] occurred in a time of great legal flux and uncertainty, and the governing laws did not specify in any detail a precise legal form that was required to achieve a desired legal result. Lease enterprises were largely an unprecedented legal form prior to the enactment of the 1989 Fundamental Principles on Leasing. . . . The Fundamental Principles themselves did not specify any forms for achieving the transformation, leaving it to the parties to fall back on the general provisions of the Civil Code as well as relevant administrative regulations. Because the Civil Code had not been drafted with this transformation in mind, it operated more by way of negative pregnant than prescriptively. The Code, along with other Soviet legislation, provided for an elaborate process, involving multiple administrative determinations and significant documentation, to achieve the liquidation of an enterprise. Soviet legislation also had elaborate formalities and requirements, involving registration, maintenance of a bank account, and tax filings, with which an enterprise had to comply to stay in existence. But the transformation of a state enterprise into a lease enterprise entailed neither the liquidation nor the continuation of the former state enterprise. As a result, there was no official document stating that this transformation had occurred. Rather a process of exclusion of other alternatives produced this legal result. There would be a lease agreement between the new entity and the old entity's superior agency (in [this] case, Goskino . . .), and no official act liquidating the old entity. . . . The absence of any liquidation, accompanied by proof that the old entity had ceased to exist . . . established by process of elimination that a transformation had occurred. Although it might have been desirable for the 1989 Fundamentals to provide for more formality on this point, the fact remains that this legislation did not. A recent book by Judge S.A. Gerasimenko, a member of the High Arbitrazh Court, discusses this point in some detail. *See* S.A. Gerasimenko, Rental as an Organizational–Legal Form of Enterprise 39–41 (2001).

Stephan Supp. Decl., June 20, 2001 ¶ 14.

Professor Stephan's description of the background of the leasing legislation establishes the incompatibility of the High Arbitrazh Court's conclusions with the purpose of the Fundamental Principles on Leasing.

The ultimate flaw in defendants' position, however, is that if the High Arbitrazh Court's December 18, 2001 decision leads to the conclusion that the lease enterprise did not succeed to ownership of Soyuzmultfilm Studio's copyrights—a conclusion that is never explicitly reached in the High Court's decision, but which implicitly follows from the determination that the state enterprise was not transformed into the lease enterprise—then there would appear to have been no entity actually authorized to grant a copyright license for Soyuzmultfilm Studio films during the decade-long term of the lease agreement. Defendants have suggested a would-be licensee should, or could, somehow have sought to obtain a license from the state. *See, e.g.,* Tr. of Apr. 9, 2002 Oral Arg. at 19. But the uncontroverted evidence presented by Professor Stephan indicates that by March 1989 the Soviet government had disclaimed whatever monopoly interests it had formerly exercised over the foreign distribution of films produced by Soviet film studios. On September 19, 1989, the state enterprise Soyuzmultfilm Studio obtained a license from the Ministry of Foreign Economic Relations authorizing the studio to exploit its film library in the international market. Thus, as of that date, a foreign investor seeking to purchase So-

yuzmultfilm Studio's films could only do so through direct transactions with the studio. In 1992, an investor, such as FBJ, could not, as a practical matter, have acquired a copyright license from the state enterprise. That entity had ceased all operations in December 1989, having transferred all its assets and personnel to the lease enterprise. Indeed, if defendants' analysis of this issue is correct, then there was no place for FBJ, or any investor seeking foreign distribution rights for Soyuzmultfilm Studio films, to go to obtain a license.

In sum, the High Arbitrazh Court is plainly incorrect in concluding that the establishment of the lease enterprise did not result in the transformation of the original state enterprise into the lease entity—a position that is inconsistent with the court's prior treatment of similar transactions. Accordingly, just as a court in a civil law jurisdiction is not strictly bound by prior judicial decisions, this court, in seeking to discern Russian law, is free to apply its best understanding of the relevant statutes—especially when this understanding is supported by the majority of the lower arbitrazh court decisions in the record, by the overwhelming scholarly consensus that motion picture copyrights belong to the studio and not the state, and by the undeniable fact that the state enterprise could not be found and did not exist in any practical sense after the execution of the lease agreement, in December 1989.

If the High Arbitrazh Court's clearly erroneous decision impacted only the rights of Russian parties, this court might, nevertheless, defer to the High Court's arbitrary departure from what appears to have been the consensus understanding of the leasing legislation. However, insofar as this ruling affects the rights of a non-Russian party, FBJ, which invested over three million dollars in acquiring a copyright license for Soyuzmultfilm Studio's films, and in developing the commercial value of these copyrights, the sudden shift in Russian law effected by the High Arbitrazh Court's decision, which operates to deprive an American corporation of its substantial investment, is simply unconscionable. For these reasons, this court will not defer to the conclusions articulated in High Arbitrazh Court's December 18, 2001 decision.

### (c) Allegations of Judicial Misconduct

As an explanation for the High Arbitrazh Court's abrupt turnabout concerning the role of lease enterprises in the privatization of Russia's formerly socialist economic system, plaintiffs have advanced allegations of pervasive corruption in the Russian courts, and in particular of bias against private enterprises engaged in disputes with the state concerning property ownership. *See* Feb. 8, 2002 Letter of Julian Lowenfeld at 2 (alleging a "significant decrease" in the "independence of the Russian judiciary" under President Putin, "in connection with a creeping nationalization of ... the media, including providers of entertainment"). Beyond these general allegations, plaintiffs have submitted documents from the High Arbitrazh Court's case file, which they claim demonstrate improper governmental influence over the arbitrazh court proceedings in the FSUESMS–SMS litigations, in violation of various provisions of the Arbitrazh Procedure Code and the Constitution of the Russian Federation. According to plaintiffs, this alleged illicit conduct unfairly biased the High Arbitrazh Court against SMS.

The resulting decision, plaintiffs maintain, amounts to a thinly-veiled attempt to re-nationalize Soyuzmultfilm Studio's copyrights to the detriment of FBJ, a foreign investor that expended millions of dollars to develop the commercial value of the

studio's library of animated films. FBJ acted in reliance on the copyright license it acquired from the lease enterprise Soyuzmultfilm Studio, without any remotely contemporaneous objection from the Russian government or from any other party. Plaintiffs assert that, under these circumstances, for this court to reverse the previous ruling in deference to the December 18, 2001 decision would "harm a United States corporation [FBJ] in violation of Constitutional safeguards such as due process, [and the prohibitions against] ex post facto laws and the unlawful taking of personal property." Pls.' Opp'n to Recons. at 9.

Dr. Pashin, who has done considerable work in the area of judicial reform in the Russian Federation, provides some illuminating and troubling commentary on the present state of the Russian judiciary. According to Dr. Pashin, although Russian constitutional and statutory law provide that "[i]n consideration of economic disputes, no priority should be given to the state and those in possession of its property,"[45] this principle is not widely adhered to in practice. Pashin Decl. ¶¶ 51–52. For one thing, Dr. Pashin explains, the judges and staff of the current arbitrazh courts are for the most part former employees of the Soviet "State Arbitrazh," a system that was designed to resolve disputes between socialist enterprises administratively rather than judicially, "with an implied objective of [protecting] the Soviet state's interests." *Id.* ¶ 53. Until August 7, 2000, long after the fall of the communist regime, the civil procedure code under which the arbitrazh courts operated recognized "the protection 'of the Socialist economic system and Socialist property' " as a guiding principle in civil legal proceedings, and "judges were instructed to resolve civil cases based on law in accordance with the socialist sense of justice." *Id.* ¶ 55 (internal quotation marks omitted). Thus, Dr. Pashin contends, the current generation of Russian judges, having been "raised in the spirit of Soviet law," perpetuate a pro-state approach "simply by inertia." *Id.*

In addition to the lingering ideological influence of Russia's recent communist past, Dr. Pashin cites other factors that he believes further bias the arbitrazh courts against private property holders involved in disputes with the state. The arbitrazh courts have been consistently underfunded and are dependent on budget allotments from the Russian Federation Government. According to Dr. Pashin, this state of affairs has the effect of seriously compromising the independence of the judiciary:

> Court chairmen, including the heads of the Supreme Court of the Russian Fed-

---

**45.** The equality of state and private entities before the arbitrazh courts is set forth in a variety of provisions, which Dr. Pashin delineates:

> Pursuant to Part 2, Article 8 of the Russian Federation Constitution, "Russian Federation equally recognizes and protects private, state, municipal, and other property forms." The Federal Constitutional Law of April 28, 1995 "On Arbitrazh Courts in the Russian Federation" among the fundamental principles of the arbitrazh court activities names "the equality of organizations and citizens before the law and court" (Article 6.) "Justice in the arbitrazh court is implemented on the basis of equality of organizations before the law and the court regardless of the location, subordination, and property form," says Article 6 of the current Arbitrazh Procedural Code of the Russian Federation. Item 1 of the Decree of the Plenary Session of the Higher Arbitrazh Court of the Russian Federation No. 8 of February 25, 1998 "On some issues of the practice of resolution of disputes concerned with protection of property right[s] and other material rights," says that "[t]he rights of ownership, use and disposal of their property [by] all property owners are subject to court protection in equal manner." Pashin Decl. ¶ 51.

eration and the [High] Arbitrazh Court, are interested in maintaining friendly relations with the authorities, especially because the judges and the staff ... while being on a relatively modest salary, receive far greater benefits (such as company cars, summer houses, low cost vacations at resorts, service in Kremlin hospitals and clinics for themselves and their families, clothing at special tailor's shops, passes to the exclusive cafeteria on Ilyinka street, and apartments) from the hands of the officials of the Russian Federation President's Administration. *Id.* ¶ 57. The court chairmen, in turn, use their power over case assignments, promotions, and the distribution of various benefits among lower court judges to influences these judges' rulings.[46] *See id.* ¶ 58. ▇▇▇ Evidence undermining "the essential fairness of [a] judicial system" can, in a sufficiently extreme case, justify non-recognition of a judgment or decision rendered by the courts of that system. Restatement (Third) of Foreign

Relations Law § 482, cmt. b (1987); *see also Diorinou,* 237 F.3d at 143 ("[D]eference as a matter of comity often entails consideration of the fairness of a foreign adjudicating system."); *Bridgeway Corp. v. Citibank,* 201 F.3d 134 (2d Cir.2000) (upholding a district court's refusal to enforce a money judgment from the courts of Liberia, on the ground that the judgment was rendered by a system that did not provide impartial tribunals or procedures compatible with the requirements of due process). In this regard, "[e]vidence that the judiciary was dominated by the political branches of government ... would support a conclusion that the legal system was one whose judgments are not entitled to recognition." Restatement (Third) of Foreign Relations Law § 482, cmt. b (1987).

Although the alleged flaws in the Russian judicial system are troublesome, the present record does not support a sweeping condemnation of Russia's judiciary.[47]

---

**46.** Dr. Pashin's general assessment of the Russian judiciary finds some support in a recent report from the United States Department of State. The report characterizes the judiciary as "weak" and "subject to political influence." While acknowledging some recent reforms (mostly in the area of criminal procedure), the report concludes that Russian "judges are only beginning to assert their constitutionally mandated independence from other branches of government." United States Department of State, Bureau of European and Eurasian Affairs, *Background Note: Russia* (October 2002), *available at* http://www.state.gov/r/pa/ei/bgn/3183.htm. Although this report is admittedly brief and conclusory in its description of Russia's judicial system, the willingness of the State Department to state publicly such conclusions is not without significance.

**47.** Three judges in the Southern District of New York have recently considered, and rejected, allegations of bias and inadequate procedures in the Russian arbitrazh courts, in the context of determining whether Russia consti-

tutes an "adequate forum" under a *forum non conveniens* analysis. *See Base Metal Trading SA v. Russian Aluminum,* 253 F.Supp.2d 681 (S.D.N.Y.2003); *Pavlov v. The Bank of N.Y. Co., Inc.,* 135 F.Supp.2d 426 (S.D.N.Y.2001), *vacated on other grounds,* 25 Fed.Appx. 70 (2d Cir. 2002); *Parex Bank v. Russian Savings Bank,* 116 F.Supp.2d 415 (S.D.N.Y.2000). In *Pavlov* and *Parex Bank,* the plaintiffs' arguments against transfer rested on general, largely conclusory, accusations of corruption. *See Pavlov,* 135 F.Supp.2d at 434 ("[I]t would be inappropriate ... to pass judgment on the [Russian judicial system], particularly on the basis of the sort of broad brush, hearsay accounts upon which plaintiffs' attack rests."); *Parex Bank,* 116 F.Supp.2d at 423-25 (concluding that a foreign forum cannot be found to be inadequate on the basis of "general allegations of judicial corruption," and that plaintiff failed to prove its claims that the Russian courts provide inadequate procedural safeguards and are biased against foreign litigants).

The plaintiffs in *Base Metal Trading* appear to have offered a somewhat more particular-

*Cf. Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine,* 311 F.3d 488, 499 (2d Cir.2002) (noting the Second Circuit's "reluctan[ce] to find foreign courts 'corrupt' or 'biased'"). However, in this case, it is unnecessary to reach any broad conclusions as to the impartiality and essential fairness of the arbitrazh system as a whole. Plaintiffs have produced specific evidence—in the form of documents obtained from the High Arbitrazh Court's file—of improprieties in the specific arbitrazh court proceedings leading up to the December 18, 2001 decision. *See* Restatement (Third) of Foreign Relations Law § 482, cmt. b (1987) ("[A] particular case may disclose such defects as to make the particular judgment not entitled to recognition."); *Diorinou,* 237 F.3d at 143 (stating that "a case-specific inquiry is sometimes appropriate" when determining the propriety of deference to a foreign court ruling). The relevant documents were discovered by Larissa N. Riabchenko, an attorney who has represented SMS in the arbitrazh courts since 1999. *See* Decl. of Larissa N. Riabchenko [hereinafter "Riabchenko Decl."] ¶ 2.

In an affidavit submitted in conjunction with Dr. Pashin's Declaration, Ms. Riabchenko explains that, contrary to Russian law, SMS never received a copy of the complaint that the Deputy Prosecutor General of the Russian Federation filed with the High Arbitrazh Court on October 15, 2001, initiating the appeal that led to the December 18, 2001 decision. Therefore, she went to the court to review the complaint. While Ms. Riabchenko was perusing the court file, two documents caught her attention, *see id.* ¶¶ 3–4, both of which have been presented to this court in English translation. The first of these documents appears to be the minutes of a "consultation meeting" of the Deputy Chairman of the Russian Federation, held on March 30, 2001. *See* Ex. 2, attached to Riabchenko Decl. The agenda of the meeting concerned the "creation of necessary conditions for the activity of the Federal State Unitarian Enterprise [Soyuzmultfilm Studio]." *Id.* at 2. In addition to the director of the third-party plaintiff here, FSUESMS, an array of officials from the executive branch of the Russian Federation government attended the meeting, including representatives of: 1) the Ministry of Culture; 2) the Ministry of Property; 3) the Prosecutor General's office; 4) the Russian agency for Patents and Trademarks; 5) the Department of the State Regulation and Development of Cinematography; 6) the Staff of the Russian Federation Government; and 7) the Administration of the President of the Russian Federation. Controversially, at least according to plaintiffs, a representative of the High Arbitrazh Court, E.A. Lyubichev,[48] was also present at the meeting. *See id.* at 1–2.

The attendees appear to have concluded that "as a result of the uncoordinated ac-

---

ized showing of official corruption. That suit was brought in response to the alleged illegal takeover of two Russian companies, facilitated, in part, by sham bankruptcy proceedings in the arbitrazh courts. Among their evidentiary submissions, the plaintiffs produced an affidavit from a former Russian government official who claims to have exerted improper influence over bankruptcy proceedings at the behest of a corrupt Russian governor. *See* 253 F.Supp.2d at 704. Ultimately, the court

concluded that the plaintiffs had not shown indicia of corruption in the particular bankruptcy proceedings that precipitated their suit, *see id.* at 705–06, and that the record did not justify "a mass indictment of the Russian judicial system." *Id.* at 709.

48. The minutes identify E.A. Lyubichev as the "Senior Consultant of the Administration of Generalization of Judicial Practice of the High Arbitrazh Court of the Russian Federation." *Id.* at 1.

tions of the interested state organizations the measures necessary for the preservation of the state interests in the process of the settlement of the situation surrounding [Soyuzmultfilm Studio] have not been undertaken." *Id.* at 2. To remedy this situation, the parties agreed to undertake various efforts on behalf of FSUESMS, with the stated purpose of protecting "state interests." *Id.* The Ministry of Culture, for instance, was to develop a long-term plan for the development of FSUESMS, and, together with the Ministry of Property, to look into procuring additional premises for the activity of the Unitarian Enterprise. It was also decided that the Russian Agency for Patents would take steps to "secure" FSUESMS's control over the use of the Soyuzmultfilm Studio trademark within Russia and would assist in the protection of the trademark internationally. The Ministry of Culture was assigned the task of studying the lawfulness of the use of Soyuzmultfilm Studio films by Russian television stations. *Id.* at 2–3.

In the context of these various strategies to aid FSUESMS, the participants at the consultation meeting also addressed the litigation between SMS and FSUESMS, which was at that time ongoing before the arbitrazh courts. To this end, the Ministry of Property was instructed to secure the participation of its representative in the legal proceedings "on a permanent basis." *Id.* at 3. It was decided that the Prosecutor General would be asked "to take necessary measures to supervise over court acts which have become legally effective, which were made under the appeals by [FSUESMS] and the Mos-

cow Region Prosecutor's Office, for the purpose of verifying their lawfulness and groundedness." *Id.* Plaintiffs' allegations of misconduct focus primarily on item 7 on the agenda, which expressed the intent to "[a]sk the High Arbitrazh Court of the Russian Federation (V.A. Yakovlev) [49] to carry out, in procedural forms established by federal law, the court supervision over the cases re: the appeals of [FSUESMS], the Moscow Region Prosecutor's Office, and [SMS], which are being considered in the Arbitrazh courts of Moscow and the Moscow Region." *Id.*

Plaintiffs' expert Dr. Pashin argues that the participation of a High Arbitrazh Court representative at the March 30, 2001 consultation meeting constituted an unlawful form of collaboration between the executive and judicial branches of the Russian government in violation of the principle of division of authorities set forth in Article 10 of the Russian Federation Constitution.[50] *See* Pashin Decl. ¶ 43. As Dr. Pashin sees it, the minutes uncovered by Ms. Riabchenko demonstrate that "a representative of the highest level body of judicial power [participated] in a consultation meeting organized at the highest level body of executive power, in order to discuss, in particular, the specific issues being considered by arbitrazh courts in a specific case and to develop recommendations to the General Prosecutor's Office of the Russian Federation and the High Arbitrazh Court." *Id.* For Dr. Pashin, this participation in itself "makes doubtful the impartiality of both the High Arbitrazh Court and the lower arbitrazh courts in their

**49.** V.A. Yakovlev is the Chairman of the High Arbitrazh Court of the Russian Federation.

**50.** Article 10 of the Russian Constitution provides that "State power in the Russian Federation shall be exercised on the basis of the separation of the legislative, executive and

judiciary branches. The bodies of legislative, executive and judiciary powers shall be independent." Const. of the Russian Federation, *available at* http://www.supcourt.ru/EN/frames.htm (last visited Apr. 15, 2003)

consideration of the cases in question." *Id.*

The second document Ms. Riabchenko uncovered is an office memorandum from E.A. Lyubichev, the High Arbitrazh Court representative who attended the March 30 consultation meeting, to A.A. Arifullin, whom plaintiffs identity as a High Court judge. *See* Ex. 1, attached to Riabchenko Decl. The letter's subject heading references the case number of the appeal that resulted in the December 18, 2001 decision; the text of the letter relays the substance of the consultation meeting and in particular conveys the request outlined in item 7 of the minutes:

> At the aforesaid consultation meeting at the Deputy Chairman of the Russian Federation Government a wish was expressed about the necessity by all state organs to provide the protection of interests of the Russian Federation (the Federal State Unitarian Enterprise [Soyuzmultfilm Studio] ) and in particular the reinforcement of control on behalf of the General Prosecutor's Office and the High Arbitrazh Court of the Russian Federation over the decisions of the said courts.

*Id.*

Dr. Pashin contends that item 7 of the consultation meeting minutes, together with the follow-up office memorandum, provides convincing evidence that executive officials improperly pressured the High Arbitrazh Court to intervene in the Soyuzmultfilm Studio litigation on behalf of FSUESMS. More specifically, according to Dr. Pashin, the High Arbitrazh Court Chairman was assigned the task of conducting "court supervision" over pending litigation between FSUESMS and SMS. Thus, the High Arbitrazh Court was treated "not as the independent body of judicial power that it is supposed to be, but as if it was some mid-level department,

one of, as it is said in the preamble to the [minutes], 'the interested state organizations.'" Pashin Decl. ¶ 46. Moreover, because at the time of the consultation meeting, the lower arbitrazh courts were still considering appeals in the FSUESMS-SMS litigation, the request for High Arbitrazh Court "supervision" over these cases was inappropriate. Under Russian constitutional law, High Court intervention in matters pending before a lower court constitutes "an unlawful interference [with] the court's activity." *Id.* ¶ 48. The Chairman of the High Arbitrazh Court is empowered to initiate review of lower court decisions only "upon the completion of court proceedings in the lower courts and only after the lower courts' decisions take effect." *Id.*

Thus, Dr. Pashin infers that the "court supervision" contemplated at the consultation meeting was in fact a euphemism for the concept of "control." *Id.* ¶ 49. He does not explain precisely what this concept entails, but it appears to refer to various practices, common during the Soviet period but in principle illegal in the Russian Federation, through which court officials, under pressure from other branches of government, would take steps to ensure pro-state outcomes in court proceedings. *See* July 6, 2002 Letter of Kenneth Feinswog at 2. Dr. Pashin supports his deduction by noting that the office memorandum to High Arbitrazh Court Judge A.A. Arifullin specifically refers to "the reinforcement of control" over the decisions of the courts presiding over the litigation between FSUESMS and SMS. See Pashin Decl. ¶ 49.

Defendants argue that, contrary to plaintiffs' allegations of improper, indeed illegal, conduct, the presence of a High Court representative at a consultation meeting of executive branch officials was entirely appropriate. Professor Maggs notes that the Arbitrazh Procedure Code

and the Federal Constitutional Law, entitled "On Arbitrazh Courts in the Russian Federation," both of which Dr. Pashin helped draft according to his affidavit, expressly provide for ex parte contact between officials of the High Arbitrazh Court and litigants seeking High Court review of lower court decisions.

This is because under Articles 180–181 of the 1995 Arbitrazh Procedure Code, review of a lower court ruling by the High Arbitrazh Court is possible only if the Chairman or Deputy Chairman of the court or the Prosecutor General or Deputy Prosecutor General makes a formal "protest" of the lower court decision. Under Article 185, the parties to an arbitrazh court litigation can only petition these officials for review. According to Professor Maggs, in practice, parties seeking High Arbitrazh Court review make their petitions in writing and also request meetings to argue that the decisions should be reviewed. Under High Arbitrazh Court procedure, these petitions and meetings are ex parte, and the opposing party is only afforded notice and an opportunity to be heard if and when a formal protest is made and a hearing is scheduled. *See* Maggs 9th Supp. Decl. ¶ 39. Professor Maggs notes that the Russian government, represented by the Ministry of State Property, was a party to the FSUESMS-SMS litigations. Therefore, Professor Maggs claims, it was proper for the various agencies representing the government's interests to meet with High Arbitrazh Court officials for the purpose of asking the High Court Chairman to exercise his discretion to "protest" the lower court rulings. *See id.*

Even if Professor Maggs were correct that some sort of ex parte hearing would have been an appropriate means for the Russian government, as a party to the arbitrazh litigations, to petition the Chairman of the High Arbitrazh Court to initiate review of lower court decisions, the

stated objective of the March 30 meeting was not to argue the merits of FSUESMS's case against SMS or to seek High Court review of the lower courts' rulings against FSUESMS. Rather the broader purpose of the meeting was to coordinate efforts of government officials to advance state interests by "securing [the] necessary conditions for the activity of [FSUESMS]." Indeed, the memorandum sent to High Arbitrazh Court Judge A.A. Arifullin does not simply relay a request for High Court intervention in the FSUESMS–SMS litigations, but rather specifically conveys the Russian government's view concerning "the necessity by all state organs to provide the protection of interests of the Russian Federation." Thus, the assertion that the Arbitrazh Procedure Code provides for some ex parte *communications* between High Court officials and would-be appellants of lower court rulings (including representatives of the Russian government in those cases in which the government happens to be a litigant) does not explain or justify what is alleged to have happened here: improper ex parte *collaboration* between representatives of the executive branch and the judiciary.

Viewed in the light most favorable to defendants, the consultation meeting documents Dr. Pashin discusses demonstrate that the December 18, 2001 decision of the High Arbitrazh Court resulted from a concerted attempt on the part of Russian government officials to assert state property interests that certain of these officials may feel were improvidently (or improperly) transferred to private ownership, and ultimately conveyed to a foreign investor, perhaps without adequate compensation to the state. In the first of his many submissions to this court, Professor Maggs explained that the privatization of the Russian economy in the late 1980s and 1990s

was riddled with corruption. During this period, Professor Maggs reports, it was distressingly common for managers entrusted with state property to engage in systematic plundering of former state enterprises, selling the state-owned property abroad and often hiding the proceeds in offshore bank accounts. *See* Maggs Decl. ¶ 62 (citing Bernard Black, et al., *Russian Privatization and Corporate Governance: What Went Wrong?*, 52 Stan. L.Rev. 1731 (2000)). According to Professor Maggs, in the case of Soyuzmultfilm Studio

> [a]llegations that the Lessee Organization and the joint stock company have been engaged in "asset stripping" are at the heart of the ongoing litigation in Russia. This is why it was the Public Prosecutor of the Moscow Region who brought the case against the Joint Stock Company in the Arbitrazh Court of [the] Moscow Region and why the Ministry of State Property of the Russian Federation has been a party to all the litigation taking place in Russia related to this case.

*Id.* ¶ 62.

Without gainsaying the prevalence of corruption among many managers charged with administering state property during the tumultuous transformation of the Russian economy to a system of private ownership, it is difficult to see precisely what state-owned assets the lease enterprise and SMS can be said to have "stripped" as a result of the copyright license granted to FBJ in 1992. The tangible property transferred to the lease enterprise was obvious-ly not a subject of that agreement, and, moreover, that property was by all accounts duly returned to the state after the expiration of the lease. As far as the studio's intangible property is concerned, it is clear that since at least 1928 (eight years before the establishment of Soyuzmultfilm Studio) Soviet law vested ownership of film copyrights in the studio that produced the film. What is more, by the time FBJ acquired the disputed copyright license, in 1992, the Soviet government had already, some three years earlier, deliberately abdicated its longstanding monopoly over the foreign distribution of films produced by state enterprise film studios. Under these circumstances, it appears that the Russian government is now seeking to reacquire rights that were knowingly and voluntarily relinquished even before the December 1989 lease agreement initiated the privatization of Soyuzmultfilm Studio.

It is telling in this regard that, at as late a stage in this protracted litigation as the April 9, 2002 oral argument, when this court asked defendants to clarify precisely which Russian government agency actually exercised the copyright ownership rights defendants claim belonged in 1992 (and allegedly still belong) to the Russian state, FSUESMS's counsel, was unable to give a clear answer. *Compare* Tr. of Apr. 9, 2002 Oral Arg. at 20, lines 1–2 ("If it was a foreign entity, it would have been [Sovexportfilm].") [51]; *with id.* at 20, lines 6–7 ("It would have been the State Enterprise [that] succeeded to [Sovexportfilm].") [52]; *id.* at 20, lines 18–19 ("I suppose it would have been Goskino.") [53]; *and id.* at 21,

---

**51.** The record indicates that Sovexportfilm was divested of its monopoly over foreign film distribution on March 14, 1988. *See* Stephan Decl., Jan. 22, 2001 ¶ 4.

**52.** There is no evidence that any state agency succeeded to Sovexportfilm's monopoly rights. Rather, on September 19, 1989, the state enterprise Soyuzmultfilm Studio re-ceived a license to exploit its film library through direct contracts with foreign parties. *See id.*

**53.** Goskino lost its authority over the export of foreign films on March, 7, 1989. *See id.*

lines 1–2 (asserting that the Ministry of Culture had an office to which a would-be copyright licensee could have gone). Ultimately, counsel conceded that he did not know where up the bewildering chain of Russian bureaucracy FBJ would have found the agency authorized to grant the copyright license FBJ sought in 1992. *See id.* at 20. In fact, the record is utterly devoid of any evidence indicating that such an agency even existed.

Professor Maggs' most recent declaration asserts that the predecessor to the Ministry of State Property was the agency authorized to license the Soyuzmultfilm Studio copyrights, having purportedly succeeded, following the collapse of the Soviet Union, to the broad authority over studio property formerly exercised by Goskino. *See* Maggs 9th Supp. Decl. ¶ 28. However, the Russian government's course of conduct during the ten years of the lease belies this entirely unsubstantiated assertion. Significantly, despite an explicit request from this court, *see* Tr. of Apr. 9, 2002 Oral Arg. at 61, defendants have introduced no evidence that the Ministry of Property, Goskino, or any other agency of the Russian government granted any copyright licenses or took any action whatsoever with respect to the Soyuzmultfilm Studio copyrights during the ten-year lease term.

Instead, the current record establishes to the satisfaction of this court that at the time FBJ obtained the disputed copyright license in May 1992, there was only one entity that purported to exercise any ownership interest in the Soyuzmultfilm copyrights: the lease enterprise, which was subsequently transformed into the joint stock company, SMS. Moreover, from 1992 to 1999 no body of the Russian government—not Goskino, not the Property Ministry, not the Public Prosecutor, not the supposedly existing, though admittedly non-functioning, state enterprise—sought to challenge the legality of the copyright license FBJ obtained from the lease enterprise. *See* Stephan Decl., Jan. 22, 2001 ¶ 22.

There is absolutely no evidence of any attempt on the part of the lease enterprise or SMS to conceal the licensing transaction with FBJ or to hide the proceeds acquired therefrom. On the contrary, as Professor Stephan notes, the 1992 licensing agreement specifies that payments to the lease enterprise are to be made in a Russian account controlled by a Russian government bank. *See id.* ¶ 20. Tax records submitted to the court by plaintiffs further demonstrate that the lease enterprise paid taxes to the state for revenue received from FBJ under the 1992 agreement. *See* Ex. F, attached to Decl. of Anya Zontova. These uncontroverted facts cast significant doubt on any claims that the actions of the lease enterprise in granting a copyright license constituted illicit asset-stripping.

The Russian government may well have reasons to rethink the propriety of various privatization reforms enacted over the past decade. As far as its own citizens are concerned, the Russian government is free to embark on a course to reclaim ownership rights through legislation, or through re-distributive litigation in the arbitrazh courts of the sort that appears to have been attempted here.[54] The propriety of

---

54. With regard to SMS, the Russian government may have accomplished its purpose. The April 20, 2001 decision of the Federal Arbitrazh Court for the District of Moscow invalided SMS's corporate registration, albeit on grounds that would appear to have no bearing on the question of copyright ownership. *See* Apr. 20 Dec. at 7. Plaintiffs initially represented that they intended to appeal this decision, but there has been no further indication that the April 20 ruling has been reversed or otherwise modified. In their cross-mo-

such actions is not for this court to determine. However, vague and dilatory allegations of asset-stripping cannot now, at this late date, be used to impair the contractual rights of FBJ, an American corporation that acted in good faith, expending millions of dollars to develop the commercial value of Soyuzmultfilm Studio's animated films.

Aside from the faulty legal analysis underpinning the High Arbitrazh Court's December 18, 2001 decision, these considerations provide an independent basis to reject the High Court's rationale, but also reinforce the conclusion that Russian law provided for the transformation of the state enterprise Soyuzmultfilm Studio into the lease enterprise, resulting in the transfer of the studio's copyrights to the lease enterprise by operation of law. To the extent the High Arbitrazh Court's decision undermines this court's determination that FBJ acquired a valid copyright license from the lease enterprise in 1992, that decision is entitled to no deference and will not be followed.

(6)

Plaintiffs advance a significant alternative argument in favor of their claim to copyright ownership, based on principles of equity and agency law, which merits some discussion. Put simply, the argument is that even if defendants are correct in their assertion that the copyrights in Soyuzmultfilm Studio's Soviet-era films are property of the Russian state, and, therefore, the lease enterprise had no actual authority to grant FBJ an exclusive license in 1992, various acts and omissions attributable to the state either: 1) induced FBJ's reasonable reliance by cloaking the lease enterprise with apparent authority to license the Soyuzmultfilm Studio copyrights; or 2) had the effect of ratifying FBJ's licensing agreement after it was executed.

Plaintiffs point to three main sources of evidence in support of this alternative claim to copyright ownership. First, plaintiffs have produced a letter sent to the lease enterprise by the Chairman of the Committee on Cinematography of the Russian Federation, Roskomkino. *See* Ex. 22, attached to Decl. of Julian Lowenfeld [hereinafter "Sept. 16 Letter"]. The letter is dated September 16, 1992, just under four months after the lease enterprise and FBJ signed their licensing agreement. Joan Borsten, President of FBJ, explains that the lease enterprise obtained the letter after FBJ's Los Angeles Bank requested some official confirmation that the lease enterprise was, in fact, authorized to license Soyuzmultfilm Studio's films. *See* Borsten Decl. ¶ 6. The letter erroneously asserts that the Russian government is the "sole owner" of films "produced by [Soyuzmultfilm] Studio using funds from the State budget." Sept. 16 Letter. Howev-

tions for summary judgment, the parties debated whether the April 20 ruling had already taken effect or whether the defects in SMS's registration could be easily remedied.

SMS's standing to bring suit in this court depends on its valid corporate existence under Russian law. In fact, after the initial set of decisions in the arbitrazh litigations resulted in the cancellation of FSUESMS's registration, plaintiffs argued that FSUESMS lacked standing to bring its third-party complaint because it no longer legally existed in Russia.

*See* Pls.' Mot. Dis. at 7. However, this court need not at this time determine whether SMS continues to exist in Russia. Whatever SMS's present status as a legal entity under Russian law, it is clear that the lease enterprise validly possessed the copyrights in Soyuzmultfilm Studio's animated films at the time FBJ acquired its copyright license. Therefore, "FBJ's rights under the agreement would still be enforceable against anyone currently claiming ownership of the copyrights." *Films by Jove*, 154 F.Supp.2d at 476 n. 40.

er, it nevertheless confirms the studio's "exclusive rights for worldwide distribution" of those films. *Id.*

Second, plaintiffs point to a January 22, 1997 document from the Russian State Taxation Auditors, which specifically references the lease enterprise's 1992 agreement with FBJ, indicating that the lease enterprise paid taxes on the proceeds received from FBJ. *See* Ex. F, attached to Decl. of Anya Zontova. According to plaintiffs, this document demonstrates that the Russian government was aware of the copyright license FBJ acquired in 1992, and that the government permitted the transaction to go forward, "accepting the benefits" of the deal by collecting the applicable tax revenues.

Last, plaintiffs have submitted two licensing agreements between the lease enterprise and what plaintiffs claim are state-owned Russian television studios.[55] *See* Exs. D and E, attached to Decl. of Anya Zontova. The translated portions of the agreements do not indicate which particular films were licensed. However, plaintiffs represent that the licenses covered Soyuzmultfilm Studio's pre 1989 films. *See* Tr. of Apr. 9, 2002 Oral Arg. at 23. Plaintiffs offer no extensive discussion of the significance of these documents, but the apparent implication is that, if the Russian state in fact owned the copyrights, there would have been no reason for a state-owned enterprise to approach the lease enterprise Soyuzmultfilm Studio to obtain broadcasting rights for the films.

Plaintiffs' alternative claim to the Soyuzmultfilm Studio copyrights raises a potentially complex choice of law question, which the parties have for the most part ignored. Plaintiffs do note in one of their submissions that the licensing agreement between FBJ and the lease enterprise contained a choice of law clause, indicating that California law would govern the agreement. Based on this provision, plaintiffs contend that their apparent authority argument should be evaluated under California law. *See* Pls.' Supp. Reply Mem. of Law at 5. Courts will generally enforce a contractual choice of law provision in a dispute between the parties to a contract—at least where the dispute concerns the construction or validity of the contract. However, it does not necessarily follow that this court should apply California law to plaintiffs' alternative arguments, which do not actually concern the contract itself, but rather involve determining whether actions undertaken entirely in Russia, by agencies of the Russian government, could have induced FBJ to rely on the apparent authority of the lease enterprise.

In the end, however, there is no need to resolve this choice of law question. It is clear that Soviet law initially vested the ownership of Soyuzmultfilm Studio's copyrights in the state enterprise, and that these rights were transferred by operation of law to the lease enterprise in 1989. Thus, this court need not determine whether FBJ's license might be validated under an alternative apparent authority or ratification theory, if—contrary to the overwhelming evidence in the record—the Russian state and FSUESMS in fact had a valid claim to ownership of the Soyuzmultfilm Studio copyrights. Moreover, a determination of whether FBJ could claim rights in Soyuzmultfilm Studio's films based solely on the apparent authority of the lease enterprise or acts of the Russian state supposedly ratifying the licensing transaction would likely require additional evidentiary hearings. For example, it would be necessary to establish, among other things, the authority of the govern-

---

55. The second licensing agreement is signed by an entity called "Public Russian Televi-

sion." However the contract refers to this entity as a "private joint stock company."

ment agency that sent the September 16, 1992 letter, and the precise circumstances under which the letter was issued, as well as FBJ's awareness of the acts that purportedly induced its reliance.

It would appear, however, that plaintiffs' additional evidentiary submissions, although not conclusive, provide further evidence in support of the lease enterprise's actual authority over the copyrights in Soyuzmultfilm Studio's animated films. All of these documents reflect the general consensus, throughout the decade-long lease term, that the lease enterprise was the valid titleholder of the studio's copyrights.

## Conclusion

Neither of the foreign court rulings upon which defendants and FSUESMS base their joint motion for reconsideration warrants the drastic relief they seek. The French court opinions from the Sovexportfilm infringement litigation do not constitute controlling interpretations of the complex issues of Russian law upon which this case turns. With good reason, therefore, these decisions were not relied on in this court's August 27, 2001 ruling, and any subsequent developments in the French courts provide no basis for modifying the previous order. Furthermore, those aspects of the Paris Appeals Court's October 2, 2001 decision that appear favorable to defendants' position—namely, the suggestion that Sovexportfilm continued to exercise exclusive commercial exploitation rights in Soyuzmultfilm Studio's films after March 1988—are clearly refuted by the evidence in this case.

Although the December 18, 2001 decision of the High Arbitrazh Court of the Russian Federation demands closer consideration, that opinion likewise does not merit reconsideration of this court's prior decision granting summary judgment to the plaintiffs. Hardly a resounding vindication of defendants' theory of the case,

the High Arbitrazh Court's opinion offers no direct discussion of the central issue presently before this court: ownership of the copyrights in Soyuzmultfilm Studio's classic films. Thus, the High Court's decision does nothing to undermine this court's conclusion, supported by the overwhelming consensus of scholarly commentary, that the copyrights in Soviet motion pictures belonged to the studio that produced the film.

The High Court boldly asserts that the formation of the lease enterprise Soyuzmultfilm Studio did not result in the transformation of the original state enterprise film studio. If true, this conclusion would negate this court's finding that Soyuzmultfilm Studio's copyrights passed to the lease enterprise in 1989, such that they could be validly conveyed by that entity to FBJ. However, this aspect of the High Arbitrazh Court's analysis is plainly erroneous, and unjustifiably departs from the universal understanding that the purpose of the Fundamental Principles on Leasing was, as a part of Perestroika, to effect the incremental transformation of state enterprises into private companies. Indeed, the High Arbitrazh Court itself endorsed this very view in a previous decision in which it acknowledged that a state enterprise was transformed into a lease enterprise. It is, furthermore, apparent that the High Arbitrazh Court's December 18, 2001 decision was strongly influenced, if not coerced, by the efforts of various Russian government officials seeking to promote "state interests." Under these circumstances, the High Arbitrazh Court's decision is entitled to no deference.

Ultimately, despite the seemingly endless twists and turns in the international litigation over Soyuzmultfilm Studio's copyrights, the basic facts underlying FBJ's infringement suit have remained essentially unchanged. Defendants have all

along conceded to having engaged in unauthorized copying of Soyuzmultfilm Studio's animated films, thus clearly infringing the copyrights in these works. Indeed, defendants acknowledge that their infringing activities continued unabated even after this court issued a preliminary injunction, on consent, expressly prohibiting defendants from reproducing any motion picture in which plaintiffs own the copyright. Defendants have never asserted that their use of Soyuzmultfilm Studio's films was authorized; rather their sole defense is that FBJ and SMS are not the proper plaintiffs to bring this infringement suit.

It remains the conclusion of this court, however, that FBJ obtained a valid copyright license in 1992 from the lease enterprise. FBJ's licensor acquired its rights in 1989, when the state enterprise Soyuzmultfilm Studio was transformed into a lease entity, in accordance with the Fundamental Principles on Leasing. At the time FBJ obtained its license, this lease enterprise—which was indistinguishable in its personnel, facilities, and equipment from its predecessor—was the only entity in a position to grant such a license. Significantly, between 1992 and 1999, neither Goskino, nor the state enterprise, nor anyone else sought to challenge the validity of FBJ's licensing agreement, and it was only after FBJ's substantial investment in restoring Soyuzmultfilm Studio's animated films for potentially lucrative international distribution that the Russian government initiated an attempt to reacquire the commercial exploitation rights it had long ago ceded voluntarily.

Accordingly, the motion for reconsideration is denied. Plaintiffs shall submit a proposed judgment on notice.